# UNITED STATES *v.* TOPCO ASSOCIATES, INC.

No. 70–82.   Argued November 16, 1971—Decided March 29, 1972

Marshall, J., delivered the opinion of the Court, in which Doug-las, Brennan, Stewart, and White, JJ., joined. Blackmun, J., filed an opinion concurring in the result, *post*, p. 612. Burger, C. J., filed a dissenting opinion, *post*, p. 613. Powell and Rehn-quist, JJ., took no part in the consideration or decision of the case.

*Howard E. Shapiro* argued the cause for the United States. With him on the briefs were *Solicitor General Griswold* and *Deputy Assistant Attorney General Comegys.*

*Victor E. Grimm* argued the cause for appellee. With him on the brief were *John T. Loughlin* and *William R. Carney.*

Mr. Justice Marshall delivered the opinion of the Court.

The United States brought this action for injunctive relief against alleged violation by Topco Associates, Inc. (Topco), of § 1 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. § 1. Jurisdiction was grounded in § 4 of the Act, 15 U. S. C. § 4. Following a trial on the merits, the United States District Court for the Northern District of Illinois entered judgment for Topco, 319 F. Supp. 1031, and the United States appealed directly to this Court pursuant to § 2 of the Expediting Act, 32 Stat. 823, as amended, 15 U. S. C. § 29. We noted probable jurisdiction, 402 U. S. 905 (1971), and we now reverse the judgment of the District Court.

## I

Topco is a cooperative association of approximately 25 small and medium-sized regional supermarket chains that operate stores in some 33 States.[1] Each of the member chains operates independently; there is no pooling of earnings, profits, capital, management, or advertising resources. No grocery business is conducted under the Topco name. Its basic function is to serve as a purchasing agent for its members.[2] In this capacity, it procures and distributes to the members more than 1,000 different food and related nonfood items, most of which are distributed under brand names owned by Topco. The association does not itself own any manufacturing, processing, or warehousing facilities, and the items that it procures for members are usually shipped directly from the packer or manufacturer to the members. Payment is made either to Topco or directly to the manufacturer at a cost that is virtually the same for the members as for Topco itself.

All of the stock in Topco is owned by the members, with the common stock, the only stock having voting rights, being equally distributed. The board of directors, which controls the operation of the association, is drawn from the members and is normally composed of high-ranking executive officers of member chains. It is the board that elects the association's officers and ap-

---

[1] Topco, which is referred to at times in this opinion as the "association," is actually composed of 23 chains of supermarket retailers and two retailer-owned cooperative wholesalers.

[2] In addition to purchasing various items for its members, Topco performs other related functions: e. g., it insures that there is adequate quality control on the products that it purchases; it assists members in developing specifications on certain types of products (e. g., equipment and supplies); and it also aids the members in purchasing goods through other sources.

points committee members, and it is from the board that the principal executive officers of Topco must be drawn. Restrictions on the alienation of stock and the procedure for selecting all important officials of the association from within the ranks of its members give the members complete and unfettered control over the operations of the association.

Topco was founded in the 1940's by a group of small, local grocery chains, independently owned and operated, that desired to cooperate to obtain high quality merchandise under private labels in order to compete more effectively with larger national and regional chains.[3] With a line of canned, dairy, and other products, the

---

[3] The founding members of Topco were having difficulty competing with larger chains. This difficulty was attributable in some degree to the fact that the larger chains were capable of developing their own private-label programs.

Private-label products differ from other brand-name products in that they are sold at a limited number of easily ascertainable stores. A&P, for example, was a pioneer in developing a series of products that were sold under an A&P label and that were only available in A&P stores. It is obvious that by using private-label products, a chain can achieve significant cost economies in purchasing, transportation, warehousing, promotion, and advertising. These economies may afford the chain opportunities for offering private-label products at lower prices than other brand-name products. This, in turn, provides many advantages of which some of the more important are: a store can offer national-brand products at the same price as other stores, while simultaneously offering a desirable, lower priced alternative; or, if the profit margin is sufficiently high on private-brand goods, national-brand products may be sold at reduced price. Other advantages include: enabling a chain to bargain more favorably with national-brand manufacturers by creating a broader supply base of manufacturers, thereby decreasing dependence on a few, large national-brand manufacturers; enabling a chain to create a "price-mix" whereby prices on special items can be lowered to attract customers while profits are maintained on other items; and creation of general goodwill by offering lower priced, higher quality goods.

association began. It added frozen foods in 1950, fresh produce in 1958, more general merchandise equipment and supplies in 1960, and a branded bacon and carcass beef selection program in 1966. By 1964, Topco's members had combined retail sales of more than $2 billion; by 1967, their sales totaled more than $2.3 billion, a figure exceeded by only three national grocery chains.[4]

Members of the association vary in the degree of market share that they possess in their respective areas. The range is from 1.5% to 16%, with the average being approximately 6%. While it is difficult to compare these figures with the market shares of larger regional and national chains because of the absence in the record of accurate statistics for these chains, there is much evidence in the record that Topco members are frequently in as strong a competitive position in their respective areas as any other chain. The strength of this competitive position is due, in some measure, to the success of Topco-brand products. Although only 10% of the total goods sold by Topco members bear the association's brand names, the profit on these goods is substantial and their very existence has improved the competitive potential of Topco members with respect to other large and powerful chains.

It is apparent that from meager beginnings approximately a quarter of a century ago, Topco has developed into a purchasing association wholly owned and operated by member chains, which possess much economic muscle, individually as well as cooperatively.

## II

Section 1 of the Sherman Act provides, in relevant part:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of

---

[4] The three largest chains are A&P, Safeway, and Kroger.

trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . ."

The United States charged that, beginning at least as early as 1960 and continuing up to the time that the complaint was filed, Topco had combined and conspired with its members to violate § 1 [5] in two respects. First, the Government alleged that there existed:

"a continuing agreement, understanding and concert of action among the co-conspirator member firms acting through Topco, the substantial terms of which have been and are that each co-conspirator member firm will sell Topco-controlled brands only within the marketing territory allocated to it, and will refrain from selling Topco-controlled brands outside such marketing territory."

The division of marketing territories to which the complaint refers consists of a number of practices by the association.

Article IX, § 2, of the Topco bylaws establishes three categories of territorial licenses that members may secure from the association:

"(a) *Exclusive*—An exclusive territory is one in which the member is licensed to sell all products bearing specified trademarks of the Association, to the exclusion of all other persons.

"(b) *Non-exclusive*—A non-exclusive territory is one in which a member is licensed to sell all products bearing specified trademarks of the Association, but not to the exclusion of others who may also be licensed to sell products bearing the same trademarks of the Association in the same territory.

"(c) *Coextensive*—A coextensive territory is one

---

[5] Topco was named in the complaint as the sole defendant, but the complaint clearly charged that its members, while not defendants, were coconspirators in Topco's violation of the Sherman Act.

in which two (2) or more members are licensed to sell all products bearing specified trademarks of the Association to the exclusion of all other persons. . . ."

When applying for membership, a chain must designate the type of license that it desires. Membership must first be approved by the board of directors, and thereafter by an affirmative vote of 75% of the association's members. If, however, the member whose operations are closest to those of the applicant, or any member whose operations are located within 100 miles of the applicant, votes against approval, an affirmative vote of 85% of the members is required for approval. Bylaws, Art. I, § 5. Because, as indicated by the record, members cooperate in accommodating each other's wishes, the procedure for approval provides, in essence, that members have a veto of sorts over actual or potential competition in the territorial areas in which they are concerned.

Following approval, each new member signs an agreement with Topco designating the territory in which that member may sell Topco-brand products. No member may sell these products outside the territory in which it is licensed. Most licenses are exclusive, and even those denominated "coextensive" or "non-exclusive" prove to be *de facto* exclusive. Exclusive territorial areas are often allocated to members who do no actual business in those areas on the theory that they may wish to expand at some indefinite future time and that expansion would likely be in the direction of the allocated territory. When combined with each member's veto power over new members, provisions for exclusivity work effectively to insulate members from competition in Topco-brand goods. Should a member violate its license agreement and sell in areas other than those in which it is licensed, its membership can be terminated under Art. IV, §§ 2 (a) and 2 (b) of the

bylaws. Once a territory is classified as exclusive, either formally or *de facto,* it is extremely unlikely that the classification will ever be changed. See Bylaws, Art. IX.

The Government maintains that this scheme of dividing markets violates the Sherman Act because it operates to prohibit competition in Topco-brand products among grocery chains engaged in retail operations. The Government also makes a subsidiary challenge to Topco's practices regarding licensing members to sell at wholesale. Under the bylaws, members are not permitted to sell any products supplied by the association at wholesale, whether trademarked or not, without first applying for and receiving special permission from the association to do so.[6] Before permission is granted, other licensees (usually retailers), whose interests may potentially be affected by wholesale operations, are consulted as to their wishes in the matter. If permission is obtained, the member must agree to restrict

---

[6] Article IX, § 8, of the bylaws provides, in relevant part:

"Unless a member's membership and licensing agreement provides that such member may sell at wholesale, a member may not wholesale products supplied by the Association. If a membership and licensing agreement permits a member to sell at wholesale, such member shall control the resale of products bearing trademarks of the Association so that such sales are confined to the territories granted to the member, and the method of selling shall conform in all respects with the Association's policies."

Shortly before trial, Topco amended this bylaw with an addition that permitted any member to wholesale in the exclusive territories in which it retailed. But the restriction remained the same in all other cases.

It is apparent that this bylaw on its face applies whether or not the products sold are trademarked by Topco. Despite the fact that Topco's general manager testified at trial that, in practice, the restriction is confined to Topco-branded products, the District Court found that the bylaw is applied as written. We find nothing clearly erroneous in this finding. Assuming, *arguendo,* however, that the restriction is confined to products trademarked by Topco, the result in this case would not change.

the sale of Topco products to a specific geographic area and to sell under any conditions imposed by the association. Permission to wholesale has often been sought by members, only to be denied by the association. The Government contends that this amounts not only to a territorial restriction violative of the Sherman Act, but also to a restriction on customers that in itself is violative of the Act.[7]

From the inception of this lawsuit, Topco accepted as true most of the Government's allegations regarding territorial divisions and restrictions on wholesaling, although it differed greatly with the Government on the conclusions, both factual and legal, to be drawn from these facts.

Topco's answer to the complaint is illustrative of its posture in the District Court and before this Court:

> "Private label merchandising is a way of economic life in the food retailing industry, and exclusivity is the essence of a private label program; without exclusivity, a private label would not be private. Each national and large regional chain has its own exclusive private label products in addition to the nationally advertised brands which all chains sell. Each such chain relies upon the exclusivity of its own private label line to differentiate its private

---

[7] When the Government first raised this point in the District Court, Topco objected on the ground that it was at variance with the charge in the complaint. The District Court apparently agreed with Topco that the complaint did not cover customer limitations, but permitted the Government to pursue this line on the basis that if the limitations were proved, the complaint could later be amended. App. 141. Topco acquiesced in this procedure, and both sides dealt with customer limitations in examining witnesses. The District Court made specific findings and conclusions with respect to the totality of the restraints on wholesaling. In light of these facts, the additional fact that the complaint was never formally amended should not bar our consideration of the issue.

label products from those of its competitors and to attract and retain the repeat business and loyalty of consumers. Smaller retail grocery stores and chains are unable to compete effectively with the national and large regional chains without also offering their own exclusive private label products.

. . . . .

"The only feasible method by which Topco can procure private label products and assure the exclusivity thereof is through trademark licenses specifying the territory in which each member may sell such trademarked products." Answer, App. 11.

Topco essentially maintains that it needs territorial divisions to compete with larger chains; that the association could not exist if the territorial divisions were anything but exclusive; and that by restricting competition in the sale of Topco-brand goods, the association actually increases competition by enabling its members to compete successfully with larger regional and national chains.

The District Court, considering all these things relevant to its decision, agreed with Topco. It recognized that the panoply of restraints that Topco imposed on its members worked to prevent competition in Topco-brand products,[8] but concluded that

"[w]hatever anti-competitive effect these practices may have on competition in the sale of Topco pri-

---

[8] The District Court recognized that "[t]he government has introduced evidence indicating that some applications by Topco members to expand into territories assigned to other members have been denied," 319 F. Supp. 1031, 1042, but concluded that these decisions by Topco did not have an appreciable influence on the decision of members as to whether or not to expand. Topco expands on this conclusion in its brief by asserting that "the evidence is uncontradicted that a member has never failed to build a new store because it was unable to obtain a license." Brief for Appellee 18 n. 18. The problem with the conclusion of the District Court and the

vate label brands is far outweighed by the increased ability of Topco members to compete both with the national chains and other supermarkets operating in their respective territories." 319 F. Supp. 1031, 1043 (1970).

The court held that Topco's practices were procompetitive and, therefore, consistent with the purposes of the antitrust laws. But we conclude that the District Court used an improper analysis in reaching its result.

## III

On its face, § 1 of the Sherman Act appears to bar any combination of entrepreneurs so long as it is "in restraint of trade." Theoretically, all manufacturers, distributors, merchants, sellers, and buyers could be considered as potential competitors of each other. Were § 1 to be read in the narrowest possible way, any commercial contract could be deemed to violate it. *Chicago Board of Trade* v. *United States,* 246 U. S. 231, 238 (1918) (Brandeis, J.). The history underlying the formulation of the antitrust laws led this Court to conclude, however, that Congress did not intend to prohibit all contracts, nor even all contracts that might in some insignificant degree or attenuated sense restrain trade or competition. In lieu of the narrowest possible reading of § 1, the Court adopted a "rule of reason" analysis for determining

---

assertion by Topco is that they are wholly inconsistent with the notion that territorial divisions are crucial to the existence of Topco, as urged by the association and found by the District Court. From the filing of its answer to the argument before this Court, Topco has maintained that without a guarantee of an exclusive territory, prospective licensees would not join Topco and present licensees would leave the association. It is difficult to understand how Topco can make this argument and simultaneously urge that territorial restrictions are an unimportant factor in the decision of a member on whether to expand its business.

whether most business combinations or contracts violate the prohibitions of the Sherman Act. *Standard Oil Co. v. United States,* 221 U. S. 1 (1911). An analysis of the reasonableness of particular restraints includes consideration of the facts peculiar to the business in which the restraint is applied, the nature of the restraint and its effects, and the history of the restraint and the reasons for its adoption. *Chicago Board of Trade* v. *United States, supra,* at 238.

While the Court has utilized the "rule of reason" in evaluating the legality of most restraints alleged to be violative of the Sherman Act, it has also developed the doctrine that certain business relationships are *per se* violations of the Act without regard to a consideration of their reasonableness. In *Northern Pacific R. Co.* v. *United States,* 356 U. S. 1, 5 (1958), Mr. Justice Black explained the appropriateness of, and the need for, *per se* rules:

> "[T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken."

It is only after considerable experience with certain business relationships that courts classify them as *per se*

violations of the Sherman Act. See generally Van Cise, The Future of Per Se in Antitrust Law, 50 Va. L. Rev. 1165 (1964). One of the classic examples of a *per se* violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition. Such concerted action is usually termed a "horizontal" restraint, in contradistinction to combinations of persons at different levels of the market structure, *e. g.*, manufacturers and distributors, which are termed "vertical" restraints. This Court has reiterated time and time again that "[h]orizontal territorial limitations . . . are naked restraints of trade with no purpose except stifling of competition." *White Motor Co.* v. *United States,* 372 U. S. 253, 263 (1963). Such limitations are *per se* violations of the Sherman Act. See *Addyston Pipe & Steel Co.* v. *United States,* 175 U. S. 211 (1899), aff'g 85 F. 271 (CA6 1898) (Taft, J.); *United States* v. *National Lead Co.,* 332 U. S. 319 (1947); *Timken Roller Bearing Co.* v. *United States,* 341 U. S. 593 (1951); *Northern Pacific R. Co.* v. *United States, supra; Citizen Publishing Co.* v. *United States,* 394 U. S. 131 (1969); *United States* v. *Sealy, Inc.,* 388 U. S. 350 (1967); *United States* v. *Arnold, Schwinn & Co.,* 388 U. S. 365, 390 (1967) (STEWART, J., concurring in part and dissenting in part); *Serta Associates, Inc.* v. *United States,* 393 U. S. 534 (1969), aff'g 296 F. Supp. 1121, 1128 (ND Ill. 1968).

We think that it is clear that the restraint in this case is a horizontal one, and, therefore, a *per se* violation of § 1. The District Court failed to make any determination as to whether there were *per se* horizontal territorial restraints in this case and simply applied a rule of reason in reaching its conclusions that the restraints were not illegal. See, *e. g.*, Comment, Horizontal Territorial Restraints and the Per Se Rule, 28 Wash. & Lee L. Rev. 457, 469 (1971). In so doing, the District Court erred.

*United States* v. *Sealy, Inc., supra,* is, in fact, on all fours with this case. Sealy licensed manufacturers of mattresses and bedding to make and sell products using the Sealy trademark. Like Topco, Sealy was a corporation owned almost entirely by its licensees, who elected the Board of Directors and controlled the business. Just as in this case, Sealy agreed with the licensees not to license other manufacturers or sellers to sell Sealy-brand products in a designated territory in exchange for the promise of the licensee who sold in that territory not to expand its sales beyond the area demarcated by Sealy. The Court held that this was a horizontal territorial restraint, which was *per se* violative of the Sherman Act.[9]

Whether or not we would decide this case the same way under the rule of reason used by the District Court is irrelevant to the issue before us. The fact is that courts are of limited utility in examining difficult economic problems.[10] Our inability to weigh, in any mean-

---

[9] It is true that in *Sealy* the Court dealt with price fixing as well as territorial restrictions. To the extent that *Sealy* casts doubt on whether horizontal territorial limitations, unaccompanied by price fixing, are *per se* violations of the Sherman Act, we remove that doubt today.

[10] There has been much recent commentary on the wisdom of *per se* rules. See, *e. g.,* Comment, Horizontal Territorial Restraints and the Per Se Rule, 28 Wash. & Lee L. Rev. 457 (1971); Averill, Sealy, Schwinn and Sherman One: An Analysis and Prognosis, 15 N. Y. L. F. 39 (1969); Note, Selected Antitrust Problems of the Franchisor: Exclusive Arrangements, Territorial Restrictions, and Franchise Termination, 22 U. Fla. L. Rev. 260, 286 (1969); Sadd, Antitrust Symposium: Territorial and Customer Restrictions After *Sealy* and *Schwinn,* 38 U. Cin. L. Rev. 249, 252–253 (1969); Bork, The Rule of Reason and the Per Se Concept, pt. 1, Price Fixing and Market Division, 74 Yale L. J. 775 (1965).

Without the *per se* rules, businessmen would be left with little to aid them in predicting in any particular case what courts will find to be legal and illegal under the Sherman Act. Should Congress ultimately determine that predictability is unimportant in this

ingful sense, destruction of competition in one sector of the economy against promotion of competition in another sector is one important reason we have formulated *per se* rules.

In applying these rigid rules, the Court has consistently rejected the notion that naked restraints of trade are to be tolerated because they are well intended or because they are allegedly developed to increase competition. *E. g., United States* v. *General Motors Corp.*, 384 U. S. 127, 146–147 (1966); *United States* v. *Masonite Corp.*, 316 U. S. 265 (1942); *Fashion Originators' Guild* v. *FTC*, 312 U. S. 457 (1941).

Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise. They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms. And the freedom guaranteed each and every business, no matter how small, is the freedom to compete— to assert with vigor, imagination, devotion, and ingenuity whatever economic muscle it can muster. Implicit in such freedom is the notion that it cannot be foreclosed with respect to one sector of the economy because certain private citizens or groups believe that such foreclosure might promote greater competition in a more important sector of the economy. Cf. *United States* v. *Philadelphia National Bank*, 374 U. S. 321, 371 (1963).

The District Court determined that by limiting the freedom of its individual members to compete with each other, Topco was doing a greater good by fostering competition between members and other large supermarket chains. But, the fallacy in this is that Topco has no authority under the Sherman Act to determine the

---

area of the law, it can, of course, make *per se* rules inapplicable in some or all cases, and leave courts free to ramble through the wilds of economic theory in order to maintain a flexible approach.

respective values of competition in various sectors of the economy. On the contrary, the Sherman Act gives to each Topco member and to each prospective member the right to ascertain for itself whether or not competition with other supermarket chains is more desirable than competition in the sale of Topco-brand products. Without territorial restrictions, Topco members may indeed "[cut] each other's throats." Cf. *White Motor Co., supra,* at 278 (Clark, J., dissenting). But, we have never found this possibility sufficient to warrant condoning horizontal restraints of trade.

The Court has previously noted with respect to price fixing, another *per se* violation of the Sherman Act, that:

> "The reasonable price fixed today may through economic and business changes become the unreasonable price of tomorrow. Once established, it may be maintained unchanged because of the absence of competition secured by the agreement for a price reasonable when fixed." *United States* v. *Trenton Potteries Co.,* 273 U. S. 392, 397 (1927).

A similar observation can be made with regard to territorial limitations. *White Motor Co., supra,* at 265 n. 2 (BRENNAN, J., concurring).

There have been tremendous departures from the notion of a free-enterprise system as it was originally conceived in this country. These departures have been the product of congressional action and the will of the people. If a decision is to be made to sacrifice competition in one portion of the economy for greater competition in another portion, this too is a decision that must be made by Congress and not by private forces or by the courts. Private forces are too keenly aware of their own interests in making such decisions and courts are ill-equipped and ill-situated for such decisionmaking. To analyze, interpret, and evaluate the myriad of competing interests and the endless data that would surely be brought to

bear on such decisions, and to make the delicate judgment on the relative values to society of competitive areas of the economy, the judgment of the elected representatives of the people is required.

Just as the territorial restrictions on retailing Topco-brand products must fall, so must the territorial restrictions on wholesaling. The considerations are the same, and the Sherman Act requires identical results.

We also strike down Topco's other restrictions on the right of its members to wholesale goods. These restrictions amount to regulation of the customers to whom members of Topco may sell Topco-brand goods. Like territorial restrictions, limitations on customers are intended to limit intra-brand competition and to promote inter-brand competition. For the reasons previously discussed, the arena in which Topco members compete must be left to their unfettered choice absent a contrary congressional determination. *United States* v. *General Motors Corp., supra;* cf. *United States* v. *Arnold, Schwinn & Co., supra; United States* v. *Masonite Corp., supra; United States* v. *Trenton Potteries, supra.* See also, *White Motor Co., supra,* at 281–283 (Clark, J., dissenting).

We reverse the judgment of the District Court and remand the case for entry of an appropriate decree.

*It is so ordered.*

MR. JUSTICE POWELL and MR. JUSTICE REHNQUIST took no part in the consideration or decision of this case.

MR. JUSTICE BLACKMUN, concurring in the result.

The conclusion the Court reaches has its anomalous aspects, for surely, as the District Court's findings make clear, today's decision in the Government's favor will tend to stultify Topco members' competition with the great and larger chains. The bigs, therefore, should find it easier to get bigger and, as a consequence, reality

seems at odds with the public interest. The *per se* rule, however, now appears to be so firmly established by the Court that, at this late date, I could not oppose it. Relief, if any is to be forthcoming, apparently must be by way of legislation.

MR. CHIEF JUSTICE BURGER, dissenting.

This case does not involve restraints on interbrand competition or an allocation of markets by an association with monopoly or near-monopoly control of the sources of supply of one or more varieties of staple goods. Rather, we have here an agreement among several small grocery chains to join in a cooperative endeavor that, in my view, has an unquestionably lawful principal purpose; in pursuit of that purpose they have mutually agreed to certain minimal ancillary restraints that are fully reasonable in view of the principal purpose and that have never before today been held by this Court to be *per se* violations of the Sherman Act.

In joining in this cooperative endeavor, these small chains did not agree to the restraints here at issue in order to make it possible for them to exploit an already established line of products through noncompetitive pricing. There was no such thing as a Topco line of products until this cooperative was formed. The restraints to which the cooperative's members have agreed deal only with the marketing of the products in the Topco line, and the only function of those restraints is to permit each member chain to establish, within its own geographical area and through its own local advertising and marketing efforts, a local consumer awareness of the trademarked family of products as that member's "private label" line. The goal sought was the enhancement of the individual members' abilities to compete, albeit to a modest degree, with the large national chains which had been successfully marketing private-label lines for

several years. The sole reason for a cooperative endeavor was to make economically feasible such things as quality control, large quantity purchases at bulk prices, the development of attractively printed labels, and the ability to offer a number of different lines of trademarked products. All these things, of course, are feasible for the large national chains operating individually, but they are beyond the reach of the small operators proceeding alone.[1]

After a careful review of the economic considerations bearing upon this case, the District Court determined that "the relief which the government here seeks would not increase competition in Topco private label brands"; on the contrary, such relief "would substantially diminish competition in the supermarket field." 319 F. Supp. 1031, 1043. This Court has not today determined, on the basis of an examination of the underlying economic realities, that the District Court's conclusions are incorrect. Rather, the majority holds that the District Court had no business examining Topco's practices under the "rule of reason"; it should not have sought to determine whether Topco's practices did in fact restrain trade or commerce within the meaning of § 1 of the Sherman Act; it should have found no more than that those practices involve a "horizontal division of markets" and are, by that very fact, *per se* violations of the Act.

I do not believe that our prior decisions justify the result reached by the majority. Nor do I believe that a new *per se* rule should be established in disposing of this case, for the judicial convenience and ready pre-

---

[1] The District Court's findings of fact include the following:

"33. A competitively effective private label program to be independently undertaken by a single retailer or chain would require an annual sales volume of $250 million or more and in order to achieve optimum efficiency, the volume required would probably have to be twice that amount." 319 F. Supp. 1031, 1036.

dictability that are made possible by *per se* rules are not such overriding considerations in antitrust law as to justify their promulgation without careful prior consideration of the relevant economic realities in the light of the basic policy and goals of the Sherman Act.

## I

I deal first with the cases upon which the majority relies in stating that "[t]his Court has reiterated time and time again that '[h]orizontal territorial limitations . . . are naked restraints of trade with no purpose except stifling of competition.' *White Motor Co.* v. *United States,* 372 U. S. 253, 263 (1963)." *White Motor,* of course, laid down no *per se* rule; nor were any horizontal territorial limitations involved in that case. Indeed, it was in *White Motor* that this Court reversed the District Court's holding that vertically imposed territorial limitations were *per se* violations, explaining that "[w]e need to know more than we do about the actual impact of these arrangements on competition to decide whether they . . . should be classified as *per se* violations of the Sherman Act." 372 U. S., at 263. The statement from the *White Motor* opinion quoted by the majority today was made without citation of authority and was apparently intended primarily to make clear that the facts then before the Court were not to be confused with horizontally imposed territorial limitations. To treat dictum in that case as controlling here would, of course, be unjustified.

Having quoted this dictum from *White Motor,* the Court then cites eight cases for the proposition that horizontal territorial limitations are *per se* violations of the Sherman Act. One of these cases, *Northern Pacific R. Co.* v. *United States,* 356 U. S. 1 (1958), dealt exclusively with a prohibited tying arrangement and is improperly cited as a case concerned with a division of

markets.[2]  Of the remaining seven cases, four involved an aggregation of trade restraints that included price-fixing agreements.  *Timken Roller Bearing Co.* v. *United States,* 341 U. S. 593 (1951); *United States* v. *Sealy, Inc.,* 388 U. S. 350 (1967);[3] *Serta Associates, Inc.* v. *United States,* 393 U. S. 534 (1969), aff'g 296 F. Supp. 1121 (ND Ill. 1968).  Price fixing is, of course, not a factor in the instant case.

Another of the cases relied upon by the Court, *United States* v. *National Lead Co.,* 332 U. S. 319 (1947), involved a world-wide arrangement[4] for dividing territo-

---

[2] There is dictum in the case to the effect that *United States* v. *Addyston Pipe & Steel Co.,* 85 F. 271 (CA6 1898), aff'd, 175 U. S. 211 (1899), established a "division of markets" as unlawful in and of itself.  356 U. S., at 5.  As I will show, however, *Addyston Pipe* established no such thing; it was primarily a price-fixing case.

[3] I cannot agree with the Court's description of *Sealy* as being "on all fours with this case." *Ante,* at 609.  *Sealy* does support the proposition that the restraints on the Topco licensees are horizontally imposed.  Beyond that, however, *Sealy* is hardly controlling here.  The territorial restrictions in *Sealy* were found by this Court to be so intimately a part of an unlawful price-fixing and policing scheme that the two arrangements fell together:

"[T]his unlawful resale price-fixing activity refutes appellee's claim that the territorial restraints were mere incidents of a lawful program of trademark licensing.  Cf. *Timken Roller Bearing Co.* v. *United States,* [341 U. S. 593 (1951)].  The territorial restraints were a part of the unlawful price-fixing and policing." 388 U. S., at 356.

[4] In summarizing its findings, the District Court made the following statements:

"When the story is seen as a whole, there is no blinking the fact that there is no free commerce in titanium.  Every pound of it is trammelled by privately imposed regulation.  The channels of this commerce have not been formed by the winds and currents of competition.  They are, in large measure, artificial canals privately constructed. . . .

.        .        .        .        .

". . . No titanium pigments enter the United States except with the consent of NL [defendant National Lead].  No foreign titanium

ries, pooling patents, and exchanging technological information. The arrangement was found illegal by the District Court without any reliance on a *per se* rule; [5] this Court, in affirming, was concerned almost exclusively with the remedies ordered by the District Court and made no attempt to declare a *per se* rule to govern the merits of the case.

In still another case on which the majority relies, *United States* v. *Arnold, Schwinn & Co.*, 388 U. S. 365 (1967), the District Court had, indeed, held that the agreements between the manufacturer and certain of its distributors, providing the latter with exclusive territories, were horizontal in nature and that they were, as such, *per se* violations of the Act. 237 F. Supp. 323, 342–343. Since no appeal was taken from this part of the District Court's order,[6] that issue was not before this Court in its review of the case. Indeed, in dealing with the issues that were before it, this Court followed an approach markedly different from that of the District Court. First, in reviewing the case here, the Court made it clear that it was proceeding under the "rule of

pigments move in interstate commerce except with like approval. No titanium pigment produced by NL may leave the ports of the United States for points outside the Western Hemisphere." 63 F. Supp. 513, 521–522.

[5] The District Court clearly decided the case under the "rule of reason." It found that there was "a combination and conspiracy in restraint of trade; and the restraint is *unreasonable*. As such it is outlawed by Section 1 of the Sherman Act." 63 F. Supp., at 523 (emphasis added). The court rejected the argument made by the defense that the basic agreement on which the arrangement was founded was permissible under "the doctrine which validates covenants in restraint of trade when reasonably ancillary to a lawful principal purpose . . . . [T]he world-wide territorial allocation was *unreasonable in scope when measured against the business actualities.*" *Id.*, at 524 (emphasis added).

[6] "The appellees did not appeal from the findings and order invalidating [territorial] restraints on resale by distributors . . . ." 388 U. S., at 368.

reason," and not by *per se* rule; [7] second, the Court saw the issues presented as involving vertical, not horizontal, restraints.[8] It can hardly be contended, therefore, that this Court's decision in *Schwinn* is controlling precedent for the application in the instant case of a *per se* rule that prohibits horizontal restraints without regard to their market effects.

Finally, there remains the eighth of the cases relied upon by the Court—actually, the first in its list of "authorities" for the purported *per se* rule. Circuit Judge (later Chief Justice) Taft's opinion for the court in *United States* v. *Addyston Pipe & Steel Co.,* 85 F. 271 (CA6 1898), aff'd, 175 U. S. 211 (1899), has generally been recognized—and properly so—as a fully authoritative exposition of antitrust law. But neither he, nor this Court in affirming, made any pretense of establishing a *per se* rule against all agreements involving horizontal territorial limitations. The defendants in that case were manufacturers and vendors of cast-iron pipe who had "entered into a combination to raise the prices for pipe" throughout a number of States "constituting considerably more than three-quarters of the territory of the United States, and significantly called . . . 'pay territory.' " 85 F., at 291. The associated defendants in

---

[7] "The Government does not contend that a *per se* violation of the Sherman Act is presented by the practices which are involved in this appeal . . . . Accordingly, we are remitted to an appraisal of the market impact of these practices.

". . . [W]e must look to the specifics of the challenged practices and their impact upon the marketplace in order to make a judgment as to whether the restraint is or is not 'reasonable' in the special sense in which § 1 of the Sherman Act must be read for purposes of this type of inquiry." 388 U. S., at 373–374.

[8] "We are here confronted with challenged vertical restrictions as to territory and dealers. . . . These are not horizontal restraints, in which the actors are distributors with or without the manufacturer's participation." 388 U. S., at 372.

combination controlled two-thirds of the manufactured output of such pipe in this "pay territory"; certain cities ("reserved" cities) within the territory were assigned to particular individual defendants who sold pipe in those cities at prices fixed by the association, the other defendants submitting fictitious bids and the selling defendants paying a fixed "bonus" to the association for each sale. Outside the "reserved" cities, all sales by the defendants to customers in the "pay territory" were, again, at prices determined by the association and were allocated to the association member who offered, in a secret auction, to pay the largest "bonus" to the association itself. The effect was, of course, that the buying public lost all benefit of competitive pricing. Although the case has frequently—and quite properly—been cited as a horizontal allocation-of-markets case, the sole purpose of the secret customer allocations was to enable the members of the association to fix prices charged to the public at noncompetitive levels. Judge Taft rejected the defendants' argument that the prices actually charged were "reasonable"; he held that it was sufficient for a finding of a Sherman Act violation that the combination and agreement of the defendants gave them such monopoly power that they, rather than market forces, fixed the prices of all cast-iron pipe in three-fourths of the Nation's territory. The case unquestionably laid important groundwork for the subsequent establishment of the *per se* rule against price fixing. It did not, however, establish that a horizontal division of markets is, without more, a *per se* violation of the Sherman Act.

## II

The foregoing analysis of the cases relied upon by the majority indicates to me that the Court is not merely following prior holdings; on the contrary, it is estab-

lishing a new *per se* rule. In the face of the District Court's well supported findings that the effects of such a rule in this case will be adverse to the public welfare,[9] the Court lays down that rule without regard to the impact that the condemned practices may have on competition. In doing so, the Court virtually invites Congress to undertake to determine that impact. *Ante,* at 611–612. I question whether the Court is fulfilling the role assigned to it under the statute when it declines to make this determination; in any event, if the Court is unwilling on this record to assess the economic impact, it surely should not proceed to make a new rule to govern the economic activity. *White Motor Co.* v. *United States,* 372 U. S., at 263.

When one of his versions of the proposed Act was before the Senate for consideration in 1890, Senator Sherman, in a lengthy, and obviously carefully prepared, address to that body, said that the bill sought

> "only to prevent and control combinations made with a view to prevent competition, or for the restraint of trade, or to increase the profits of the producer at the cost of the consumer. It is the unlawful combination, tested by the rules of common law and human experience, that is aimed at

---

[9] Among the facts found by the District Court are the following: private-label brand merchandising, which is beyond the reach of the small chains acting independently and which by definition depends upon local exclusivity, permits the merchandiser to offer the public "lower consumer prices on products of high quality" and "to bargain more favorably with national brand manufacturers"; such merchandising fosters "the establishment of a broader supply base of manufacturers, thereby decreasing dependence upon a relatively few, large national brand manufacturers"; it also enables "[s]maller manufacturers, the most common source of private label products, who are generally unable to develop national brand name recognition for their products, [to] benefit . . . by the assurance of a substantial market for their products . . . ." 319 F. Supp., at 1035.

by this bill, and not the lawful and useful combination.

. . . . .

"I admit that it is difficult to define in legal language the precise line between lawful and unlawful combinations. This must be left for the courts to determine in each particular case. All that we, as lawmakers, can do is to declare general principles, and we can be assured that the courts will apply them so as to carry out the meaning of the law . . . ." 21 Cong. Rec. 2457, 2460.

In "carry[ing] out the meaning of the law" by making its "determin[ations] in each particular case," this Court early concluded that it was Congress' intent that a "rule of reason" be applied in making such case-by-case determinations. *Standard Oil Co.* v. *United States,* 221 U. S. 1, 60 (1911). And that rule of reason was to be applied in light of the Act's policy to protect the "public interests." *United States* v. *American Tobacco Co.,* 221 U. S. 106, 179 (1911). The *per se* rules that have been developed are similarly directed to the protection of the public welfare; they are complementary to, and in no way inconsistent with, the rule of reason. The principal advantages that flow from their use are, first, that enforcement and predictability are enhanced and, second, that unnecessary judicial investigation is avoided in those cases where practices falling within the scope of such rules are found. As the Court explained in *Northern Pacific R. Co.* v. *United States, supra,* at 5,

> "[T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use."

In formulating a new *per se* rule today, the Court does not tell us what "pernicious effect on competition" the practices here outlawed are perceived to have; nor does it attempt to show that those practices "lack . . . any redeeming virtue." Rather, it emphasizes only the importance of predictability, asserting that "courts are of limited utility in examining difficult economic problems" and have not yet been left free by Congress to "ramble through the wilds of economic theory in order to maintain a flexible approach." [10]

With all respect, I believe that there are two basic fallacies in the Court's approach here. First, while I would not characterize our role under the Sherman Act as one of "rambl[ing] through the wilds," it is indeed one that requires our "examin[ation of] difficult economic problems." We can undoubtedly ease our task, but we should not abdicate that role by formulation of *per se* rules with no justification other than the enhancement of predictability and the reduction of judicial investigation. Second, from the general proposition that *per se* rules play a necessary role in antitrust law, it does not follow that the particular *per se* rule promulgated today is an appropriate one. Although it might well be desirable in a proper case for this Court to formulate a *per se* rule dealing with horizontal territorial limitations, it would not necessarily be appropriate for such a rule to amount to a blanket prohibition against all such limitations. More specifically, it is far from clear to me why such a rule should cover those division-of-market agreements that involve no price fixing and which are con-

---

[10] It seems ironical to me that in another antitrust case decided today, *Ford Motor Co.* v. *United States, ante,* p. 562, the Court, in contrast to its handling of the instant case, goes out of its way to commend another District Court for its treatment of a problem involving "predictions and assumptions concerning future economic and business events." *Id.,* at 578.

cerned only with trademarked products that are not in a monopoly or near-monopoly position with respect to competing brands. The instant case presents such an agreement; I would not decide it upon the basis of a *per se* rule.[11]

The District Court specifically found that the horizontal restraints involved here tend positively to promote competition in the supermarket field and to produce lower costs for the consumer. The Court seems implicitly to accept this determination, but says that the Sherman Act does not give Topco the authority to determine for itself "whether or not competition with other supermarket chains is more desirable than competition in the sale of Topco-brand products." *Ante,* at 611. But the majority overlooks a further specific determination of the District Court, namely, that the invalidation of the restraints here at issue "would not increase competition in Topco private label brands." 319 F. Supp., at 1043. Indeed, the District Court seemed to believe that it would, on the contrary, lead to the likely demise of those brands in time. And the evidence before the District Court would appear to justify that conclusion.

---

[11] The national chains market their own private-label products, and these products are available nowhere else than in the stores of those chains. The stores of any one chain, of course, do not engage in price competition with each other with respect to their chain's private-label brands, and no serious suggestion could be made that the Sherman Act requires otherwise. I fail to see any difference whatsoever in the economic effect of the Topco arrangement for the marketing of Topco-brand products and the methods used by the national chains in marketing their private-label brands. True, the Topco arrangement involves a "combination," while each of the national chains is a single integrated corporation. The controlling consideration, however, should be that in neither case is the policy of the Sherman Act offended, for the practices in both cases work to the benefit, and not to the detriment, of the consuming public.

There is no national demand for Topco brands, nor has there ever been any national advertising of those brands. It would be impracticable for Topco, with its limited financial resources, to convert itself into a national brand distributor in competition with distributors of existing national brands. Furthermore, without the right to grant exclusive licenses, it could not attract and hold new members as replacements for those of its present members who, following the pattern of the past, eventually grow sufficiently in size to be able to leave the cooperative organization and develop their own individual private-label brands. Moreover, Topco's present members, once today's decision has had its full impact over the course of time, will have no more reason to promote Topco products through local advertising and merchandising efforts than they will have such reason to promote any other generally available brands.

The issues presented by the antitrust cases reaching this Court are rarely simple to resolve under the rule of reason; they do indeed frequently require us to make difficult economic determinations. We should not for that reason alone, however, be overly zealous in formulating new *per se* rules, for an excess of zeal in that regard is both contrary to the policy of the Sherman Act and detrimental to the welfare of consumers generally. Indeed, the economic effect of the new rule laid down by the Court today seems clear: unless Congress intervenes, grocery staples marketed under private-label brands with their lower consumer prices will soon be available only to those who patronize the large national chains.