**SUM OF SQUARES, INC., Plaintiff,**

v.

**MARKET RESEARCH CORPORATION OF AMERICA et al., Defendants.**

**No. 75 Civil 1630.**

United States District Court,
S. D. New York.

May 14, 1975.

**54**

Quirk & Bakalor, P. C., New York City, and Hannoch, Weisman, Stern & Besser, Newark, N. J., for plaintiff; Charles H. Cottingham, Jeffrey M. Garrod, Newark, N. J., of counsel.

Townley, Updike, Carter & Rodgers, New York City, for defendants; Richard J. Barnes, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

Plaintiff, Sum of Squares, Inc., moves for a preliminary injunction to enjoin defendants from (1) refusing to supply plaintiff with certain data necessary for plaintiff to function in its business; (2) conspiring with others not to do business with plaintiff; and (3) interfering in any way with the free exercise by plaintiff of its business. Defendants are Market Research Corporation of America ("MRCA"), its president, David B. Learner, and its major stockholder, Catallactics Corporation.

The controversy concerns what to the average lay person may be a somewhat esoteric subject, marketing research, specifically (1) the collecting of data concerning the purchasing habits of a panel of consumers of various products in specified regions of the country who are demographically representative of a much larger number of consumers on a nationwide basis, and (2) the processing of such data to analyze the basic trends in consumer purchasing habits, and reporting this to a client, usually a manufacturer, or retail distributor of food products. The data, known in the trade as "national purchase diary panel data," is obtained from a panel of household consumers who record their purchases of different products in a diary and forward it weekly to a data collecting agency. The raw data contained in the diaries is transcribed onto tapes and coded into numerical information suited for computer processing and is then analyzed to provide consumer behavior information.

There are three types of companies engaged in market research activities. A company may serve both functions of "data collection" and its analysis and evaluation, referred to as "data processing." The defendant MRCA is engaged in both. A second type is a company engaged only in "data collection" which it supplies to a client, who either processes

the data itself or contracts the processing to an outside company. The third type is engaged only in the business of "data processing." Until recently, plaintiff was engaged only in data processing. Two of its clients are General Foods and Kraft Foods, which companies engaged MRCA for "data collection" purposes. MRCA, at the direction of General Foods and Kraft Foods, turned over its national diary panel tapes to plaintiff, who thereafter processed the data for General Foods and Kraft Foods.

The instant action is the result of plaintiff's engaging in "data collection" activities when it prepared a diary panel for Dupont Corporation, with the prospect of an expansion in that area of activity. Thereupon MRCA notified General Foods and Kraft Foods that it would no longer supply its data to plaintiff for processing and analysis. It also advised plaintiff to the same effect. MRCA's notice to General Foods and Kraft Foods referred to a nondisclosure clause in their contracts, similar to one included in all MRCA contracts, whereby the clients agreed not to disclose MRCA data to third parties without MRCA's prior consent. General Foods advised plaintiff that it considers the nondisclosure clause with MRCA binding.

The plaintiff charges that MRCA has embarked upon a campaign to eliminate it from not only the data collection business, but also the data processing business. Plaintiff's complaint alleges that the defendants have combined and conspired with General Foods, Kraft and others (not named as defendants), or have coerced the latter to engage in activities to eliminate plaintiff as a competitior (1) in the market for processing diary panel data, and (2) in the sub market for processing such data collected by MRCA, all in violation of the

Sherman Act. Plaintiff asserts that some thirty per cent of its gross revenues are derived from processing data gathered by MRCA and that unless the latter continues to supply it with data for processing, it faces the loss of revenues and customers, which could well lead to its extinction. Thus, it argues that preliminary injunctive relief is warranted.

MRCA denies that it is engaged in any combination or conspiracy as alleged by plaintiff and contends that its conduct is simply a unilateral refusal to deal with plaintiff or anyone who would not agree to its nondisclosure provision. Essentially its position is that it will not supply its data tapes to any data processor who is also a data collector, since to do so would make its confidential proprietary technology involving special know-how and expertise available to a competitor. Further, it contends that even if the inference that a conspiracy exists is warranted, its conduct does not violate the Sherman Act because the nondisclosure clause in its contract with clients is reasonable in order to protect it against a competitor's appropriation and use of its trade secrets and expertise.

I

*Contract, Combination or Conspiracy.*

■ In United States v. Colgate & Co.,[1] the Supreme Court held that the Sherman Act "does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal."[2] So long as "other means" beyond a "mere announcement of his policy and the simple refusal to deal" are not employed, no combination exists.[3] Here, however,

1. 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919).

2. *Id.* at 307, 39 S.Ct. at 468.

3. United States v. Parke, Davis & Co., 362 U.S. 29, 44, 80 S.Ct. 503, 512, 4 L.Ed.2d 505

(1960). *See also* Albrecht v. Herald Co., 390 U.S. 145, 149, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); House of Materials, Inc. v. Simplicity Pattern Co., 298 F.2d 867, 870 (2d Cir. 1962).

MRCA has employed "other means" to prevent plaintiff from access to its data: the nondisclosure clause in its contracts with its clients. As the General Foods' letter to plaintiff of April 14, 1975 indicates, it is the nondisclosure clause, not MRCA's mere announcement of its policy not to supply its data tapes to plaintiff or any processor who is also a data collector, that results in the alleged restraint of trade. Whether MRCA's clients willingly or unwillingly comply with the nondisclosure provision, this would not prevent the court from concluding that a contract exists for purposes of Sherman Act analysis.[4]

## II

*Restraint of Trade.*

The Supreme Court long ago announced that section 1 of the Sherman Act proscribes only an "undue" or "unreasonable" restraint of trade—in short that a "rule of reason" approach should be followed in interpreting the Act.[5] As Mr. Justice Brandeis later explained:

"Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition."[6]

More recently the Supreme Court has declared:

"An analysis of the reasonableness of particular restraints includes consideration of the facts peculiar to the business in which the restraint is applied, the nature of the restraint and its effects, and the history of the restraint and the reasons for its adoption."[7]

Over the years, certain business practices or relationships have been found to be so directly harmful to competition and so lacking in any compensating benefits that they are conclusively presumed to be unreasonable. Without inquiry into the exact injury they may have caused in any particular case or the asserted business justification for their use, they are held to be per se unreasonable and condemned by the Sherman Act.[8] The rule of per se illegality has been applied to horizontal price fixing,[9] vertical price fixing,[10] division of markets among both interbrand[11] and intrabrand[12] competitors, tying arrangements[13] and certain collective refusals to deal or "group boycotts."[14]

Plaintiff argues that MRCA's contract relationship with manufacturers of retail consumer goods such as General Foods and Kraft constitutes a group boycott and is per se illegal. However, a review of the group boycott cases reveals that the per se rule is applicable only where the purpose of the boycott is

4. Albrecht v. Herald Co., 390 U.S. 145, 150 n. 6, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968).

5. Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911).

6. Chicago Bd. of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918).

7. United States v. Topco Associates, Inc., 405 U.S. 596, 607, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972).

8. Northern Pac. Ry. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

9. United States v. Socony-Vacuum Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940).

10. Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911).

11. Timken Roller Bearing Co. v. United States, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951).

12. United States v. Topco Associates, Inc., 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972).

13. Northern Pac. Ry. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

14. Klor's Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) ; Fashion Originators' Guild of America v. F.T.C., 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941).

exclusionary or coercive. Absent such a purpose, the rule of reason approach must be applied to determine the legality of the conduct.[15] Thus a horizontal combination of retailers to boycott wholesalers who sell directly to customers is per se unreasonable since its purpose is to eliminate retail competition from wholesalers.[16] A conspiracy among manufacturers and wholesalers organized by a retailer to drive a competitive retailer out of business is per se illegal because of its plainly anti-competitive purpose.[17] Where the combination has no purpose except the stifling of competition, it is a naked restraint of trade and is per se illegal. Following this line of reasoning, plaintiff asserts that the purpose of MRCA's enforcement of its nondisclosure clause is to eliminate plaintiff as a competitor of MRCA in the data processing field and that therefore it is per se illegal.

MRCA, on the other hand, contends that the purpose of the nondisclosure clause is to guard against the unauthorized disclosure of MRCA's confidential trade secrets. It emphasizes that data gathering goes much beyond a mere recording or tabulation of the information contained in the diaries of the panel group; that preparing the data tapes for processing requires specialized knowledge and expertise so that the information will reflect the buying behavior habits of the entire population. In the preparation of the tapes, a projection factor is applied to the data in the diary panels so that the buying behavior of the sample households is projected to produce data representative of the entire country. In this process, population changes must be taken into account, either by altering the panel membership or by adjusting the projection factors. MRCA supplies these projection factors to data processors such as plaintiff and argues that to continue to provide plaintiff with its data and projection factors would be of material aid to the plaintiff in updating its own panel data and would allow plaintiff to do so without duplicating the time, expense, skill or know-how that MRCA has achieved.

Plaintiff, contrariwise, contends that the technology involved in MRCA's data gathering is already in the public domain and hence not confidential, and that even if the technology were confidential, the data tapes do not reveal this technology. Moreover, it asserts that MRCA's trade secret claims are belied by its conduct in the past five years in allowing plaintiff free access to the data.

Defendant's position, bluntly stated by it, is that to furnish plaintiff the tapes, the contents of which reflect its expertise in a constant evaluation and reevaluation of the methodology of obtaining panel information, is tantamount to "slitting its own throat"; that the antitrust laws do not require that it put itself at an economic disadvantage by supplying this material to a competitor or potential competitor.

MRCA's concern over continued dealings with plaintiff appears to have been triggered by plaintiff's work for Dupont with the prospect that plaintiff will expand its activities in the data gathering field. There is nothing necessarily inconsistent about MRCA's sudden concern for trade secrets after five years of dealings with plaintiff, given the fact that heretofore MRCA had no reason to believe that plaintiff would use the tech-

15. E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Comm., 467 F.2d 178, 187 (5th Cir. 1972), cert. denied, 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973); Jos. E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71, 76–78 (9th Cir. 1969), cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970).

16. Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 34 S. Ct. 951, 58 L.Ed. 1490 (1914).

17. Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). See also Radiant Burners, Inc. v. Peoples Gas, Light & Coke Co., 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961).

nology to gather national diary purchase data in direct competition with it.

Documentary evidence indicates that MRCA considers its data confidential. The nondisclosure clause in contracts with its clients is not a recent innovation but has been used at least since 1973. MRCA's employees sign agreements with the company not to disclose proprietary information considered confidential by the company. Its concern for unauthorized disclosure of information is documented as far back as 1963. Indeed, one of plaintiff's executive officers himself, while employed by defendant, agreed to the nondisclosure provision. MRCA admits that the data tapes do not fully reveal all of the technology involved in making them, but insists that they reveal valuable information to competitors in that their contents are constantly changing, reflecting changes in the proper demographic sampling needed to predict more accurately consumer purchasing trends.

Plaintiff contends that it is not going into the data gathering business and that therefore MRCA's confidentiality claims are a smokescreen for its predatory intent. Despite its statements to this effect in affidavits in support of the motion, at oral argument plaintiff was asked whether it would accept a preliminary injunction conditioned on its restricting any data gathering activity on its part to Dupont. Its statement that it would be unwilling to do so undercuts its earlier representations and gives substance to MRCA's claim that MRCA's conduct is for the purpose of preventing continually developing confidential information from falling into the hands of a competitor. Further supporting MRCA's contention is a purchase diary created by plaintiff containing the categories of "coffee" and "peanut butter" and other items MRCA presently gathers data on for such clients as General Foods and Kraft.

■■ Under all the circumstances,[18] the court cannot conclude that the nondisclosure clause is per se unreasonable, nor has plaintiff demonstrated that the actual or even the probable purpose of the clause and MRCA's decision to prevent plaintiff from further access to its data is predatory. It may well be argued that the nondisclosure provision contained in MRCA's contracts with its clients is a vehicle intended to accomplish a restraint of trade, but in view of the dispute about its nature and purpose, resolution of this disputed issue must await a trial. On its face, MRCA's conduct appears reasonable in light of the legitimate objective of preserving trade secrets.[19] That plaintiff is adversely affected by an otherwise reasonable restriction of this nature does not constitute a violation of the Sherman Act.[20]

## III
### Preliminary Injunctive Relief.

■ Plaintiff is entitled to a preliminary injunction "only upon a clear show-

---

18. United States v. Topco Associates, Inc., 405 U.S. 596, 607, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972).

19. As the Court of Appeals held in Susser v. Carvel Corp., 332 F.2d 505, 517 (2d Cir.), cert. granted, 379 U.S. 885, 85 S.Ct. 158, 13 L.Ed.2d 91 (1964), an ice cream franchisor with a secret formula for its ice cream mix may contract with a manufacturer that it make the ice cream solely for the franchisor and be restricted by the franchisor as to whom it will sell the mix.

20. *See* United States v. Hilton Hotels Corp., 467 F.2d 1000, 1003 (9th Cir. 1972), cert. denied, 409 U.S. 1125, 93 S.Ct. 938, 35 L. Ed.2d 256 (1973); E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Comm., 467 F.2d 178, 188 (5th Cir. 1972), cert. denied, 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973); Bushie v. Stenocord Corp., 460 F.2d 116, 119–20 (9th Cir. 1972); Bridge Corp. of America v. American Contract Bridge League, Inc., 428 F.2d 1365, 1370 (9th Cir. 1970), cert. denied, 401 U.S. 940, 91 S.Ct. 940, 28 L.Ed.2d 220 (1971); Jos. E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71, 79–80 (9th Cir. 1969), cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970); Deesen v. Professional Golfers' Ass'n of America, 358 F.2d 165, 170–71 (9th Cir.), cert. denied, 385 U.S. 846, 87 S.Ct. 72, 17 L.Ed.2d 76 (1966).

ing of either (1) probable success on the merits *and* possible irreparable injury, *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly" in its favor.[21]

The above discussion makes plain that plaintiff has not clearly shown "probable success on the merits" under the first standard for preliminary relief. Considering the second standard, the court concludes that plaintiff has similarly failed to demonstrate that the balance of hardships tips decidedly in its favor.

■ Plaintiff argues that it is appropriate to grant preliminary relief since an injunction is needed to preserve the status quo[22] to allow it to continue to receive MRCA data until there is a full trial on the merits. Such is not the case. As indicated, plaintiff's unwillingness to accept any restrictions on its activity in the data gathering business suggests it intends to enter this area. Requiring MRCA to continue to supply plaintiff with its data under this circumstance does not preserve the status quo but alters it, and this factor argues against preliminary relief.[23] Plaintiff would have the court force MRCA to continue to disclose what MRCA considers to be confidential information to an emerging competitor without binding itself to the representation made to the court in seeking this extraordinary relief that it was not entering the data collection business. Preliminary relief should not permit the plaintiff "to obtain an undue advantage by acting while the hands of its adversary are tied by the writ." [24]

■ While plaintiff asserts that some thirty per cent of its gross revenues are derived from processing MRCA data, the only concrete evidence presented of injury to plaintiff is with respect to some of its projects with General Foods. Even here General Foods has decided not to renew one of its contracts with MRCA for which plaintiff did the data processing. General Foods has also indicated that in any future contracts with MRCA it will require that the nondisclosure clause be modified so that it can terminate the agreement if MRCA refuses to permit it to disclose MRCA data to any third person it selects. Thus, it is far from certain that substantial irreparable harm will be caused plaintiff. Treble damages under the antitrust laws do not appear inadequate at this point to compensate plaintiff in the event it is successful after a trial on the merits.

Given the broad scope of mandatory relief requested,[25] plaintiff's failure to

21. Sonesta Int'l Hotels Corp. v. Wellington Associates, 483 F.2d 247, 250 (2d Cir. 1973) ; Columbia Pictures Indus., Inc. v. American Broadcasting Cos., 501 F.2d 894 (2d Cir. 1974).

22. Hollon v. Mathis Independent School Dist., 491 F.2d 92 (5th Cir. 1974) ; Exhibitors Poster Exchange, Inc. v. National Screen Serv. Corp., 441 F.2d 560 (5th Cir. 1971) ; Bath Indus., Inc. v. Blot, 427 F.2d 97, 111 (7th Cir. 1970) ; Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319, 323 (2d Cir.), cert. denied, 394 U.S. 999, 89 S. Ct. 1595, 22 L.Ed.2d 777 (1969) ; Singleton v. Anson County Bd. of Ed., 387 F.2d 349 (4th Cir. 1967) ; Continental Oil Co. v. Frontier Ref. Co., 338 F.2d 780 (10th Cir. 1964) ; Willheim v. Investors Diversified Services, Inc., 303 F.2d 276 (2d Cir. 1962) ; United States v. Feature Sports, Inc., 348 F.Supp. 966 (S.D.N.Y.1969) ; Columbia Broadcasting System, Inc. v. A.S.C.A.P., 320 F.Supp. 389, 392 (S.D.N.Y.1970) ; Rosenstiel v. Rosenstiel, 278 F.Supp. 794, 801 (S.D.N. Y.1967).

23. LaChemise Lacoste v. General Mills, Inc., 487 F.2d 312 (3d Cir. 1973) ; King v. Saddleback Junior College Dist., 425 F.2d 426 (9th Cir.), cert. denied, 404 U.S. 979, 92 S. Ct. 342, 30 L.Ed.2d 294 and 404 U.S. 1042, 92 S.Ct. 703, 30 L.Ed.2d 736 (1970) ; Meiselman v. Paramount Film Distrib. Corp., 180 F.2d 94 (4th Cir. 1950) ; Hambros Bank. Ltd. v. Meserole, 287 F.Supp. 69 (S. D.N.Y.1968).

24. American Can Co. v. Local Union 7420, United Steelworkers of America, 350 F.Supp. 810, 812 (E.D.Pa.1972), quoting 7 Moore, Federal Practice ¶ 65.04[1], (2d ed. 1972).

25. Courts are more reluctant to issue mandatory rather than prohibitory preliminary relief. Dorfmann v. Boozer, 134 U.S.App.D.C. 272, 414 F.2d 1168, 1173 (1969) ; Joseph

demonstrate probable success on the merits, and the equities not weighing heavily in plaintiff's favor, the motion for a preliminary injunction is denied.

Bancroft & Sons Co. v. Shelley Knitting Mills, Inc., 268 F.2d 569, 574 (3d Cir. 1959) ; W. A. Mack, Inc. v. General Motors Corp., 260 F.2d 886, 890 (7th Cir. 1958) ; Rosenstiel v. Rosenstiel, 278 F.Supp. 794, 801 (S.D.N.Y.1967) ; Clune v. Publishers' Ass'n of N.Y.C., 214 F.Supp. 520, 531 (S.D. N.Y.), aff'd, 314 F.2d 343 (2d Cir. 1963) ; Zugsmith v. Davis, 108 F.Supp. 913 (S.D.N. Y.1952).