**WORTHEN BANK & TRUST COMPANY, Plaintiff,**

v.

**NATIONAL BankAMERICARD INCORPORATED, Defendant.**

**No. LR–71–C–248.**

United States District Court,
E. D. Arkansas, W. D.

July 19, 1972.

Stephen D. Susman of Fulbright, Crooker & Jaworsky, Houston, Tex., Philip S. Anderson, of Wright, Lindsey & Jennings, Little Rock, Ark., for plaintiff.

John T. Williams, of Smith, Williams, Friday, Eldredge & Clark, Little Rock, Ark., John B. Bates, of Pillsbury, Madison & Sutro, San Francisco, Cal., for defendant.

## OPINION

JOHN E. MILLER, Senior District Judge.

This action comes before the court on a motion for a partial summary judgment by the plaintiff, Worthen Bank & Trust Company (Worthen). The complaint, filed on November 26, 1971, alleges that the conduct of the defendant, National BankAmericard Incorporated (NBI), violates Sections 1 and 2 of the Sherman Antitrust Act, and asks for (a) a declaratory judgment that the defendant has violated Sections 1 and 2 of the Sherman Act, (b) injunctive relief against continuing or threatening violations of said laws, and (c) damages for the violations of said laws. Specifically Worthen charges that, as a Class A member of NBI, it is restricted by a by-law of said corporation from handling any other national bank credit card.

Included in the complaint are allegations that raise the question whether the case should be prosecuted as a class action. This question has been considered and determined in a separate opinion 345 F.Supp. 1323 filed along with this opinion.

The defendant has answered the allegations of the plaintiff and denied that it has violated the Sherman Antitrust Act in any way, or that Worthen is entitled to injunctive relief or damages.

The court has jurisdiction of the parties and the subject matter under 15 U.S.C.A. § 1526.

Worthen is a corporation duly organized and existing under the banking laws of the State of Arkansas, with its office and principal place of business in Little Rock. It is a subsidiary of First Arkansas Bank Stock Corporation, a bank holding company, which also owns the Stephens Bank of Stephens, Arkansas, and the First National Bank of Hot Springs, Arkansas.

The defendant, National BankAmericard Incorporated (NBI), is a for-profit membership corporation which produces and provides a distinctive product and service: A national general purpose bank card and service under the registered marks "BankAmericard" and the "Blue, White and Gold Bands Design." The members of NBI are banks which have banded together to provide this national bank card product and service.

Prior to 1970 Worthen had been involved in the growing bank credit-card business for a number of years. In May of 1970 Worthen became a Class A, or proprietary member of NBI. On November 10, 1970, Worthen submitted an application for full membership, or proprietary membership, in the Interbank Card Association, which operates the Master Charge card system. At that time NBI had no by-law prohibiting one of its Class A members from being a part of any other national bank credit-card system. On April 5, 1971, Worthen's application to Interbank was approved, and Worthen began to negotiate merchant agreements for acceptance of Master Charge cards.

It is necessary to digress at this point into a brief summary of how a national bank credit-card system works. There are several relationships involved in the average bank credit-card transaction. There are only two national bank credit-card operations, NBI and Interbank. In both the Master Charge and BankAmericard systems there are two types of member banks. A Class A member in NBI and a full member in Interbank have the responsibility for the issuance of cards, the collection of accounts, and the operation of the interchange system, along with the Class B or associate member banks, which function merely as agent or merchant banks holding the merchants' sales slips and forwarding them to the full member or Class A bank. Banks benefit from promoting the credit cards by collection of a service charge for handling the sales paper, increased deposits from merchants who want to deposit their sales slips in the same bank where they have an account, and to a certain extent from interest on cardholder accounts which are not paid within thirty ways of receipt of a statement for the same. By the end of 1971 there were approximately 9,500 banks participating in national bank credit-card programs with approximately eight billion dollars in volume. Interbank (Master Charge) is the larger of the two systems.

A typical transaction can be described as follows: A BankAmericard holder in Little Rock, Ark., using a card issued by Worthen through one of its agent or merchant banks in another city in Arkansas travels to Dallas, Texas, where he wishes to purchase a $25 item in a store which accepts BankAmericard. After the sale the merchant takes the sales slip to a bank in Dallas which is a Class A or full member bank in the NBI system and holds a merchant agreement with the retailer. This banks pays the merchant for the sales slip, less a discount, and returns the sales slip to Worthen in Little Rock for collection from the cardholder. The Dallas bank is paid an interchange fee for handling the sales slip. This is a very simple bank credit card transaction, but it gives a general idea of how the system works.

The crux of the complaint of Worthen is that by-laws 2.15 and 2.16 of NBI violate Section 1 of the Sherman Antitrust Act, 15 U.S.C.A. § 1. As previously stated, Worthen applied for a full membership in Interbank (Master Charge) in the middle of the year 1970. NBI immediately expressed its disapproval of this action, and began an effort to determine what it could do about dual memberships in the national bank credit card systems. The end result of

all NBI's activities are reflected in the aforementioned by-laws approved on September 24, 1971, which read as follows:

"Section 2.15. Confidentiality. No member shall publish, disclose, convey or distribute to any person or organization, including, but not limited to, any parents, subsidiaries or affiliates, any confidential or proprietary matters of the corporation, including, but not limited to, documents, ideas, products and data, without the prior written consent of the corporation, except (a) to a person or organization which (i) is rendering services to such member with respect to its BankAmericard program and to the extent that such disclosure is necessary to properly perform such services, (ii) does not compete with the corporation or its members with respect to the BankAmericard program, and (iii) agrees to hold such matters in confidence; and (b) such matters that have been publicly released by the corporation.

"Section 2.16. Requirements with Respect to other Credit Cards.

(a) No Class A member shall directly or indirectly (i) own, (ii) issue, (iii) assist in the issuance of, (iv) service, (v) honor, or (vi) enter into contractual relationships with persons for the issuance of, or with merchants to honor, any Credit Cards except (1) as permitted pursuant to sections 2.04 and 2.05, (2) Area Credit Cards, and (3) Credit Cards owned or issued by any organization licensed to conduct the BankAmericard program in a foreign country.

(b) No Class A member shall directly or indirectly accept for deposit or purchase any instruments arising from the use of any Credit Cards except those arising from (i) Credit Cards issued pursuant to sections 2.04 and 2.05, (ii) Area Credit Cards, and (iii) Credit Cards owned or issued by any organization licensed to conduct the BankAmericard program in a foreign country.

(c) No Class B member shall directly or indirectly (i) enter into contractual relationships with persons for the issuance of Credit Cards, except as may be permitted by section 2.05 or (ii) own or issue in its own name Credit Cards, or (iii) appear on Credit Cards or elsewhere as the owner or issuer thereof, except Area Credit Cards.

(d) If a parent, subsidiary or affiliate of a member takes any action which the member may not take under the provisions of this section, such member shall be deemed thereby to have violated this section unless, in the case of affiliates, (i) there are no common officers or employees engaged in the management or operation of both BankAmericard and other Credit Card programs and (ii) the operations—including, without limitation, marketing, authorization, credit, collection and solicitation—of such programs are separate; provided that paragraph (c) shall not apply to parents, subsidiaries and affiliates which are Class A members. The provisions of section 2.15 shall apply, without limitation, to all officers and employees engaged in the operation of a member's Credit Card program and to all directors of members.

(e) The provisions of this section shall not apply during periods necessary to (i) convert a credit card program to or from the BankAmericard program or (ii) make an adjustment to a Credit Card program as required for compliance with this section, provided such conversion or adjustment is completed in accordance with such conditions and in such time as the corporation may require, which time shall not exceed twelve months from (1) the effective date of this section, (2) the date of acceptance of membership, (3) the date of delivery of notice of termination, or (4) the date of any future acquisition, merger or other

circumstances which necessitates an adjustment hereunder, as the case may be.

(f) 'Credit Cards' as used in this section mean any instruments, whether in the form of a card, book, plate, coupon, or other credit device owned or issued by a bank (including any of its parents, subsidiaries or affiliates) which may be used to obtain money or to purchase or lease property or services on credit but do not include letters of credit or any such instruments usable exclusively for the obtaining of money from such bank or the guaranteeing of checks.

(g) 'Area Credit Cards' as used in this section mean any Credit Cards that are owned, issued, serviced, and honored exclusively by one bank and honored by merchants having a direct contractual relationship with such bank, except that such bank may appoint any other bank as its agent with respect to the Area Credit Card program for the sole purpose of accepting for deposit sales drafts from such merchants arising from the use of such Area Credit Cards."

Since July of 1971 Worthen has been involved in a campaign to sign up merchants and associate banks in the Interbank system. Worthen has not begun to issue Master Charge cards or handle merchant agreements at this time because of a stipulation entered into in this action.

Both the plaintiff and the defendant have participated in extensive discovery. Much of the information obtained is subject to an agreed protective order entered into by the parties on or about April 7, 1972, which protects certain sensitive statistical information and business records.

On April 10, 1972, the plaintiff filed a motion for partial summary judgment, memorandum in support thereof and memorandum in support of maintenance of this action as a class action. In its motion for partial summary judgment Worthen moved the court as follows:

"1. That it enter, pursuant to Rule 56 of the Federal Rules of Civil Procedure, a partial summary judgment declaring Section 2.16 of the by-laws of defendant, National BankAmericard Incorporated, to be in violation of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1), and permanently enjoining the enforcement of the same by defendant on the ground that there is no genuine issue as to any material fact relevant to legality of the by-law and that plaintiff is entitled to judgment as a matter of law on the issue of liability alone.

"2. This motion is based upon the pleadings, depositions, answers to interrogatories, and exhibits contained in the Appendix in support of plaintiff's Motion for Partial Summary Judgment filed herewith."

In some quarters doubts have been expressed as to whether Rule 56 is applicable in the consideration of suits based upon an alleged violation of the antitrust laws.

Rule 56(c), Fed.R.Civ.P., provides:

"The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory, in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages."

In White Motor Company v. United States, (1963) 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738, the court at page 259 of 372 U.S., at page 700 of 83 S.Ct. said:

"Summary judgments have a place in the antitrust field, as elsewhere, though, as we warned in Poller v. Columbia Broadcasting System, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed. 2d 458, they are not appropriate 'where motive and intent play leading roles.' Some of the law in this area is so well developed that where, as here, the

gist of the case turns on documentary evidence, the rule at times can be devined without a trial."

In Poller v. Columbia Broadcasting System, (1962) 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458, the court at page 467 of 368 U.S., at page 488 of 82 S.Ct. said:

"Summary judgment should be entered only when the pleadings, depositions, affidavits, and admissions filed in the case 'show that [except as to the amount of damages] there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' Rule 56(c), Fed.Rules Civ.Proc., 28 U.S.C.A. This rule authorizes summary judgment 'only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is, * * * [and where] no genuine issue remains for trial * * [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try.' Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627, 64 S.Ct. 724, 728, 88 L.Ed. 967 (1944)."

In Sartor v. Arkansas Natural Gas Corp., (1944) 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967, the court at page 627 of 321 U.S., at page 728 of 64 S.Ct. said:

"The Court of Appeals below heretofore has correctly noted that Rule 56 authorizes summary judgment only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is, that no genuine issue remains for trial, and that the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try. American Insurance Co. v. Gentile Brothers Co. [5 Cir.,] 109 F.2d 732; Whitaker v. Coleman [5 Cir.,] 115 F.2d 305. In the very proper endeavor to terminate a litigation before it for the fourth time, we think it overlooked considerations which make the summary judgment an inappropriate means to that very desirable end."

Citizen Publishing Company v. United States, (1969) 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148, was a case in which the Government's complaint charged an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act, 26 Stat. 209, as amended, 15 U.S.C.A. § 1, and a monopoly violation of Section 2, 15 U.S.C.A. § 2. The District Court finding that the joint operating agreement provisions which were unlawful per se under Section 1 granted the Government's motion for summary judgment.

The case was before the Supreme Court on appeal, and at page 135 of 394 U.S., at page 929 of 89 S.Ct. the court said:

"We affirm the judgment. The § 1 violations are plain beyond peradventure."

■ In the consideration of a motion for summary judgment, the first question that must be determined is whether the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, present any genuine issue as to any material fact. If no such issue is presented by the examination of the record, the court then considers whether under the applicable law the moving party is entitled to a judgment as a matter of law.

In Giordano v. Lee, (8 Cir. 1970) 434 F.2d 1227, 1231, the court quoted from Poller, supra, and held:

"* * * that any inferences to be drawn from the underlying facts contained in the materials presented must be viewed in the light most favorable to the party opposing the motion for summary judgment. [Citations omitted.] Any doubt as to whether there is an issue of material fact for trial should be resolved against the moving party."

In Adickes v. S. H. Kress & Co., (1970) 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142, the court held that the materials relied upon did not establish the absence of a genuine issue of fact notwithstanding the failure of the appellant to come forward with an affidavit properly as-

serting the presence of the policeman in the street if she were to rely upon that fact, and approved the statement found in 6 Moore's Federal Practice, 2d Ed., ¶ 56.22[2], pp. 2824–25:

"It has always been perilous for the opposing party neither to proffer any countering evidentiary materials nor file a 56(f) affidavit. And the peril rightly continues [after the amendment to Rule 56(e)]. Yet the party moving for summary judgment has the burden to show that he is entitled to judgment under established principles; and if he does not discharge that burden then he is not entitled to judgment. No defense to an insufficient showing is required."

A full consideration of the material relied upon by the movant and the contentions of the parties as set forth in their briefs submitted to the court and the oral argument convinces the court that there is no genuine issue as to any material fact. Therefore, the only question before the court is whether the movant is entitled to a judgment as a matter of law.

Defendant submitted its answer brief in opposition to the plaintiff's motion to the court on June 2, 1972, and a reply brief was filed by the plaintiff on June 14, 1972. On June 20, 1972, extensive oral arguments were heard by the court.

The following contentions were made before the court by the respective parties in their briefs and arguments in support of and in opposition to the motion.

Worthen argued that the actions of NBI in adopting by-laws 2.15 and 2.16 constitute a horizontal group boycott, which is a per-se violation of Section 1 of the Act. It was the opinion of Worthen that there are three levels of competition in the bank credit card business: The first is competition among banks for new cardholder accounts; the second is competition between banks to set a lower discount in buying sales slips from merchants; and the third is between the individual banks which are full members

in the credit card system in developing agency relationships with other banks.

Worthen pointed out the remarkable growth of the national bank card systems and the effect it has had on consumer and commercial dealings in the last few years. Worthen argued that the competition as set out above is basically between individual banks and not between the bank credit card systems. Worthen conceded there is some competition between the systems in areas of improvement of authorization and interchange facilities and dissemination of innovations and general know-how. It was pointed out that there are no geographical limits or exclusive dealers in the bank credit card business.

In its brief Worthen stated that regardless of whether NBI is a joint venture, partnership, trade association, or management corporation, that it does constitute a combination of competing banks which control and operate NBI, and that this in turn constitutes joint activity among competitors. In the oral argument it was agreed by both parties that NBI could be characterized as a joint venture among the member banks. It was Worthen's contention that NBI constitutes a combination of competitors and that its actions in passing the by-laws restrain trade and commerce. It asserted that under the by-laws a bank can be an agent bank in both systems at the same time. Worthen stated that even NBI realizes that the bank which has both Master Charge and BankAmericard has a "competitive edge" over a bank which handles only one credit card. Worthen asserted that the benefits to a bank from handling a credit card system are numerous. A bank benefits in (1) making a profit from the merchant discount, (2) any interest earned on a cardholder's account, and (3) indirect banking business generated by attracting new customers, i. e., cardholders and merchants. Thus, Worthen claimed the bank credit card is an effective competitive tool used to attract customers, and the actions limiting Class A members of NBI

from handling any other credit card restrains competition.

Worthen further contended that any justification claimed by NBI would not be relevant to a finding that the by-law itself constitutes a per-se violation of Section 1 of the Act, and stated that the by-laws rather than preserve competition preserve a duopoly. Worthen is saying that the by-law preserves the present two systems, BankAmericard and Master Charge, and precludes the establishment of any other system because a Class A member of NBI would have to entirely disassociate itself with NBI before it could join any new national bank credit card system. Worthen further stated that it is up to Congress how to promote competition, not individual industry. Worthen contended that by-law 2.16 isolates NBI from competition from members of Interbank in the efforts of the national bank credit card systems to sign up member banks.

Worthen cited United States v. Sealy, Inc., (1967) 388 U.S. 350, 87 S.Ct. 1842, 18 L.Ed.2d 1238, and Serta Associates Inc. v. United States, (1969) 393 U.S. 534, 89 S.Ct. 870, 21 L.Ed.2d 753, for the proposition that the form of organization of NBI is insignificant to any determination to be made by this court. Worthen stated the Sealy case shows an organization very similar to that of NBI and in that case the court held that price fixing in positions imposed by Sealy were the product of a combination of competitors' efforts to restrain trade. Worthen also cited the case of Associated Press v. United States, (1945) 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed.2d 2013, as a model to follow in determining whether or not actions by a combination of competitors constitute a per-se violation of Act 1 of the Sherman Act. In that case the U. S. Supreme Court affirmed a Special Court decision, in which Judge Learned Hand of the Second Circuit carefully explained the facts and circumstances of the case before the court, and then proceeded to find a per-se violation of the Act in an instance where the Associated Press members were allowed a veto when a nonmember who filed an application for membership operated a newspaper in the circulation area of the members. The other principal case relied upon by Worthen is United States v. Topco Associates, Inc., (1972) 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515. Worthen interpreted this case as demonstrative of the fact that the court should not look beyond the pertinent facts which assisted in a determination of whether or not the actions of NBI constitute a horizontal agreement among competitors to restrain trade. According to Worthen, Topco also stands for the principle that industry is not the proper party to enforce antitrust laws.

In its oral argument Worthen re-emphasized the points made in its brief, and specifically stated that there are only two questions before the court: (1) Does by-law 2.16 restrain trade, and (2) does the by-law constitute a horizontal action among competitors to restrain trade. Worthen further alleged that since there were no disputed material facts before the court, only questions of law, that summary judgment would be proper.

In June 1972 the court received NBI's brief in opposition to the motion of Worthen. NBI first emphasized that the by-law section 2.16 does not prohibit Worthen from handling both BankAmericard and Master Charge credit cards. NBI stated that under the present by-law Worthen can become a Class B member of NBI and handle Master Charge as an associate member. NBI emphasized that the national bank credit card systems are unique. According to NBI the product it produces, BankAmericard, is of the nature that it cannot be produced by any single member bank. NBI feels that the BankAmericard is created in small parts by each member bank.

It is NBI's contention that if banks were allowed to be proprietary members in both systems, that there would be no incentive to maintain both systems and that eventually a merger would take place and only the larger of the two

systems, Interbank, would remain. It was further argued by NBI that by-laws 2.15 and 2.16 are the only reasonable alternative to prevent this merger from taking place. NBI denied that it is a horizontal combination of competitors since none of the individual banks are capable of producing the product and service provided by NBI.

NBI maintained that bank-to-bank competition does exist within the system, but that there must be competition between the systems themselves for national bank credit card systems to continue to progress and develop. According to NBI, if the two systems merge, there would certainly be antitrust problems present. NBI contended that the purpose of Worthen in acquiring a proprietary membership in both systems is to create a monopoly in the Little Rock area and participate in certain price-fixing activities in violation of sections of the Sherman and Clayton Acts. As an example of this type action, NBI cited Citizen Publishing Company v. United States, (1969) 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148. NBI asserted that this is especially true since Worthen is the dominant bank in the Little Rock area, and contended that it has an affirmative duty to prevent any unlawful merger and/or restraint of trade which would be brought about by Worthen's actions in obtaining a proprietary membership in both systems.

Incidentally NBI pointed out less significant problems which it felt would develop if one bank held a proprietary membership in both systems. According to NBI it is the duty of its Class A members to contribute knowledge they obtain about certain technical and practical advancements which they discover or come in contact with in handling bank credit card transactions. It was further contended that the by-laws of Interbank would require a member of that system not to discriminate against its system in the handling of another national bank credit card. (The Interbank by-laws contain no prohibition against dual membership.) From NBI's point of view

there is no practical way in which a bank could be a proprietary member in both systems and follow the rules of the systems, even if by-law 2.16 was not present.

In conclusion, NBI stated that there are specific issues of fact which make summary judgment improper in this case. NBI contended that the nature of the two competing bank card systems is a material fact and that there is a disagreement between Worthen and NBI as to the nature of NBI. In the alternative, NBI stated that if a summary judgment is granted that the court certify the case for interlocutory appeal.

In its oral argument NBI reemphasized certain points in its brief, the main thrust being that the by-law was not designed to lessen competition but to increase it, and that if Worthen is allowed to hold a proprietary interest in both systems, other banks would do the same thing and the result would be a merger of the NBI and Interbank systems which, in NBI's opinion, is a possible violation of the Clayton and Sherman Acts.

A reply brief was filed by Worthen on June 13, in which it stated that many of the arguments made by NBI are not relevant to a decision on the issue of whether or not there is present a per-se violation of the Sherman Act. Worthen also stated in reply the the argument of NBI that the national bank credit card systems are a unique and different business that should not be subject to accepted principles of antitrust law, that NBI, in reality, fits within the exact situation that Sealy-Serta-Associated Press and Topco fit.

The material undisputed facts as found by the court are hereinafter stated.

Worthen is a Class A member of NBI and a full member of Interbank. By-law 2.16 of NBI prohibits a Class A member of NBI from joining Interbank.

Interbank has no provision in its by-laws which prevents any member of that system from joining the system of any other national bank credit card. The

NBI by-law forecloses the possibility of development of another national bank card system by any member of NBI, but certainly not within the Interbank system where a member is allowed to participate in another national bank card system. There is competition in the bank credit card business between the individual member banks of the systems on the merchant and cardholder level and between the systems themselves in association of member banks. There are no territorial limits or exclusive dealers within the bank credit card business. NBI can best be described as a joint venture among member banks which produces an identifiable product, Bank-Americard. BankAmericard can only function through its member banks and the card could not operate without a central organizational unit, NBI, or member banks, Worthen. The bank which can issue bank credit cards holds a distinct advantage over other competing banks in the area. A bank that is a member in either of the systems will benefit from increased use of banking services by customers. A bank which could become a Class A or full member in both NBI and Interbank would have a competitive edge on other banks in the area. The present structure of the bank credit card business with respect to member bank responsibilities will to some extent be changed if banks could become full or Class A members in both Interbank and NBI at the same time. The bank credit card business is growing at a phenomenal rate and it has certain problems unique to its particular business operation.

### Applicable Law

The motion for partial summary judgment of plaintiff is based upon 15 U.S.C.A. § 1, which reads in part, as follows:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal  *  *  *."

There are two principal questions before the court: (1) Does the imposition of by-law 2.16 by NBI constitute an agreement in restraint of trade or commerce; and (2) does this action by NBI constitute a horizontal restraint of trade or commerce.

■ On the first question, the court has examined decisions of other courts to determine the effect of the action by NBI. These decisions are of limited value because each potential antitrust violation must be examined in light of its particular effect on commerce. There is no doubt that NBI considered the possibility that imposition of by-law 2.16 was in fact a restraint of trade to some extent. This is reflected by the exhibits of the plaintiff to its motion for partial summary judgment, which consists of correspondence between various corporate executives in NBI prior to the passage of by-law 2.16. This in and of itself is not sufficient grounds to find that NBI's action is a restraint of trade.

First, the court must decide what is a restraint of trade or commerce. The most recent pronouncement of the court is found in United States v. Topco Associates, supra, where the court at page 606 of 405 U.S., at page 1133 of 92 S.Ct. said:

"On its face, § 1 of the Sherman Act appears to bar any combination of entrepreneurs so long as it is 'in restraint of trade.' Theoretically, all manufacturers, distributors, merchants, sellers, and buyers could be considered as potential competitors of each other. Were § 1 to be read in the narrowest possible way, any commercial contract could be deemed to violate it. Chicago Board of Trade v. United States, 246 U.S. 231, 238 [38 S.Ct. 242, 243, 62 L.Ed. 683] (1918) (Brandeis, J.). The history underlying the formulation of the antitrust laws led this Court to conclude, however, that Congress did not intend to prohibit all contracts, nor even all contracts that might in some insignificant degree or attenuated sense restrain trade or competition. In lieu

of the narrowest possible reading of § 1, the Court adopted a 'rule of reason' analysis for determining whether most business combinations or contracts violate the prohibitions of the Sherman Act. Standard Oil Co. v. United States, 221 U.S. 1 [31 S.Ct. 502, 55 L.Ed. 619] (1911). An analysis of the reasonableness of particular restraints includes consideration of the facts peculiar to the business in which the restraint is applied, the nature of the restraint and its effects, and the history of the restraint and the reasons for its adoption. Chicago Board of Trade v. United States, supra [246 U.S.] at 238 [38 S.Ct. at 243.]"

As held by the Supreme Court, any contract between competitors can be construed as a restraint of trade of some type. It is for the court to decide whether this particular action by NBI is within the scope of Section 1 of the Sherman Act. The action by NBI has numerous effects on Class A member banks of that system. It restricts the banks to one national bank credit card. This restricts a bank from offering its customers, as cardholders and merchants, services under the Master Charge card name. It is not disputed by the parties that the only national bank credit cards currently existing are BankAmericard and Master Charge. A further imposition upon a Class A member of NBI appears in the by-law in that any subsidiary bank is also prohibited from joining the Interbank system. A competitor in the Little Rock area, Union National Bank, is a member of both systems as an agent bank and Worthen has lost some merchant customers to Union National Bank because it is more convenient for the merchants to deposit all of their sales slips in one bank for payment. One of Worthen's motives in applying for Master Charge was to better serve its cardholder customers who often travel in areas where BankAmericard is not as readily acceptable as Master Charge. Also, Worthen desires to provide certain agent banks in resort areas in the State with facilities for handling Master Charge because many tourists in this area are Master Charge cardholders. The fact that a bank handles a national bank credit card, be it Master Charge or BankAmericard, clearly gives that bank an advantage over a competitor bank. The ability to handle both cards as a full or Class A member in each system gives a bank a greatly enhanced competitive position. In light of these circumstances the court finds that by-law 2.16 constitutes a restraint of trade and commerce.

■ There are two types of restraints: (a) one which would be regarded as so inherently anticompetitive that it would be struck down without consideration of the underlying motives, purposes or effects, i. e., restraints that are illegal per se; (b) one that may have a tendency to suppress competition or operate to result in a restraint of trade but may also have certain redeeming features which may, under appropriate circumstances, save it from condemnation under Section 1 of the Sherman Act, i. e., restraints judged by the rule of reason.

The more difficult part to decide is whether or not this restraint is the result of action by competing member banks or simply a unilateral action by NBI. It is the opinion of this court that NBI is the combination of the Class A member banks and that any action taken by NBI is based upon the action or lack of action by these Class A members. The fact that NBI "produces" BankAmericard is not particularly relevant since NBI needs each member bank to produce BankAmericard. The case of United States v. Sealy, Inc., supra, is particularly helpful in this aspect. Sealy is a price fixing case, and from that standpoint is of no importance in this case. The value of Sealy is that Sealy was a corporation consisting of approximately 30 "licensees" who owned substantially all of its stock, controlled and managed its general business and produced in different areas throughout the country the Sealy mattress. The Sealy mattress, though produced individually

by each licensee, was competitive with other companies because the organization produced a nationally known product. The use of the Sealy name was the principal asset of the Sealy Corporation. Each company could produce mattresses.

Worthen is capable of producing a bank credit card. It did so for many years prior to joining the NBI system. Worthen, through NBI, can now produce the BankAmericard which is accepted by merchants throughout the country who have agreements with other member banks, and process sales slips on merchandise purchased by cardholders who have received their bank credit cards through other banks. In this aspect NBI's principal asset is the BankAmericard name and production of a uniform product with the help of Worthen and other member banks. The nature of NBI and the nature of Sealy are almost identical, and the Supreme Court at page 353 of 388 U.S. 350, at page 1850 of 87 S.Ct. 1842 held "that Sealy was a joint venture of, by, and for its stockholder-licensees". NBI is likewise a joint venture, composed of the member banks, and any action by NBI constitutes an action on behalf of and by these member banks.

It was admitted from the inception of this case that there was competition between the member banks in signing up merchants and cardholders. Therefore, the member banks of NBI are competitors, and any action by NBI must be considered as an agreement between competitors. It is quite clear that the action of NBI restrains trade, but the court must decide whether the restraint is in fact unlawful.

This brings the court to the second principal question and the question raised by plaintiff's motion for partial summary judgment: Does NBI's action constitute a horizontal restraint on trade or commerce?

Horizontal restraints on the market are considered per-se violations of Section 1 of the Sherman Act. Horizontal restraints include agreements to fix or control prices, agreements to control or limit production, exclusive sale or purchase agreements, group boycotts, and restrictive covenants (i. e., such as one not to compete with another). Vertical restraints are generally considered under the rule of reason, and include generally wholesaler-retailer relationships, such as exclusive dealership agreements and resale-price maintenance agreements. If the court finds a restraint to be a per-se violation of Section 1 (i. e., horizontal restraint) then it is not necessary for the court to consider the reasonableness of the justifications for imposition of the restraint. The reasonableness of a restraint is generally determined by a consideration of (a) the identity of the market affected by the restraint, (b) the percentage of the relevant market which is affected by the restraint, (c) the relationship of the percentage of the relevant market which is affected by the restraint to the reasonableness of the restraint.

Several cases have considered the question of per-se violations of the Sherman Act. In Lorain Journal Co. v. United States, (1951) 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162, the court upheld a District Court decision under Section 2 of the Sherman Act, which is concerned with monopolies or attempts to monopolize, finding that actions by a newspaper publisher in compelling advertisers to boycott a competing radio station resulted in a group boycott.

In Klor's, Inc. v. Broadway-Hale Stores, Inc., (1959) 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 41, the court reversed and remanded a lower court decision which had allowed a large merchant to conspire with distributors of certain well-known appliances not to sell to the plaintiff. The Supreme Court held that this was a group boycott, and therefore a per-se violation of the Sherman Act. The court also held that it is not necessary for price fixing or any effect on price to be involved in allegations of violations of the Sherman Act.

In United States v. General Motors, (1966) 384 U.S. 127, 86 S.Ct. 1321, 16

L.Ed.2d 415, the court reversed and remanded a decision of the District Court of the Southern District of California. The court held that a substantial restraint on price competition is unlawful per-se when brought about by a combination or conspiracy to do the same. The court stressed the fact that the joint action of businessmen belonging to certain automobile dealer associations to eliminate "discount or wholesale" sales of new Chevrolets, thus eliminating access to the market to certain individuals, is a per-se violation of the Sherman Act. In this case the court considered the background and reasoning for the restriction on sales, and concluded that the restriction was a violation of the Act.

In United States v. Topco Associates, Inc., supra, decided March 29, 1972, by the Supreme Court, it was determined that a cooperative association of a group of small and medium-sized independent regional supermarket chains could not establish territorial restrictions on expansion into that of another member's territorial area because it prohibited competition among stores in the area in the sale of Topco brand items. The District Court had applied the rule of reason to the restrictions and found them to be acceptable. It was Topco's contention that being a small operation composed of several small grocery chain operators, it was necessary in order to compete to restrict the sale of merchandise distributed by Topco to member merchants, said merchants each being allocated a territorial area of distribution. The Government argued that this action by Topco prohibits competition between stores in selling Topco brand products. It should be borne in mind that Topco was formed by a group of small chain operations to benefit from collective buying in order to compete with large supermarket chains. The court held that allocating territories to minimize competition is a horizontal restraint, constituting a per-se violation of Section 1 of the Sherman Act. The court cited Northern Pacific R. Co. v. United States,

356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545:

"There are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use."

At page 612 of 405 U.S. 596, at page 1136, 92 S.Ct. 1126, Mr. Justice Marshall, writing for the majority, said:

"For the reasons previously discussed, the arena in which Topco members compete must be left to their unfettered choice absent a contrary congressional determination." (Citing cases.)

Mr. Justice Blackmun, concurring with the result, at page 613 of 405 U.S., at page 1136 of 92 S.Ct. said:

"The per se rule, however, now appears to be so firmly established by the Court that, at this late date, I could not oppose it. Relief, if any is to be forthcoming, apparently must be by way of legislation."

Worthen argues that the actions of NBI constitute a group boycott which is a horizontal restraint on trade and therefore a per-se violation of Section 1 of the Sherman Act. Generally, group boycotts involve the exclusion of non-members from certain services or participation, such as in the case of United States v. Associated Press, supra. That case involved the by-laws of the Associated Press organization, particularly the provisions which prevented a new member from joining the Associated Press services over the veto of a member of the Associated Press who published a newspaper in the same area as the applicant.

In the case now before the court, Worthen is a member of NBI but will be excluded from membership in NBI in accordance with by-law 2.16 because it has acquired a proprietary membership in Interbank. This, of course, is not the typical group boycott situation, but

Judge Learned Hand, speaking for the lower court in United States v. Associated Press, D.C., 52 F.Supp. 362, said at page 369 of 52 F.Supp.:

"But these settled instances are not exhaustive; they are only illustrations of a general doctrine, whose scope they do not measure. When a situation does not fall within one of them, a court is forced to weigh the advantages gained by the combination against the injury done to the public, and apparently in this connection the public is the 'purchasers or consumers' whom the combination will deprive 'of the advantages which they derive from free competition.'" (Citations omitted.)

This court is not unmindful that all cases do not fit within a prescribed niche and that the court must, in examining these problems, look to the ultimate effect on the person served by the business allegedly acting in restraint of trade. Here the answer is obvious. Both merchants and cardholders will be better served if they are allowed to do business with a bank which handles both cards. Despite NBI's arguments to the contrary, the court believes that this will inspire even greater competition between the two systems.

A group boycott is generally considered to be a refusal to deal among certain merchants or manufacturers with other merchants and manufacturers. That is exactly what is happening in this case. NBI, through the by-law passed by its directors, is refusing to deal with Worthen because Worthen has become an Interbank licensee. The rule imposed by the by-law results in a refusal to deal between the members of the NBI system with any of their Class A members who also desire to carry the Interbank card, Master Charge. As previously cited cases show, there can be no justification for a rule of this type, and the court has no choice but to strike down the by-law as a per-se violation of the Sherman Act.

NBI argued repeatedly that to allow one bank to own a proprietary membership in both systems would result in a merger of the two card systems, and that this would violate the antitrust laws. Evidently the same argument was made in the Associated Press case, and the court disposed of it in the following manner. At page 374 of 52 F.Supp. the court said:

"The argument appears to be that if all be allowed to join AP, it may become the only news service, and get a monopoly by driving out all others. That is perhaps a possibility, though it seems to us an exceedingly remote one; but even if it became an actuality, no public injury could result. For, if AP were open to all who wished the service, could pay for it, and were fit to use it, it would be no longer a monopoly: a monopoly of all those interested in an activity is no monopoly at all, for no one is excluded and the essence of monopoly is exclusion."

The antitrust laws as reflected in the above statement were made to protect the consumers from the effects of unfair competition as much as they were made to protect businessmen. It is the opinion of this court that by-law 2.16 serves no one's real interest except NBI's.

■ Therefore, the court is of the opinion that the imposition of by-law 2.16 by NBI is in restraint of trade or commerce and that such action is a horizontal restraint of trade or commerce and a per-se violation of the antitrust laws. Worthen is entitled to an injunction prohibiting enforcement of by-law 2.16.

The issue of damages in the complaint of Worthen should be deferred until a termination of the question of liability on the part of the defendant, NBI.

Counsel for the parties shall upon receipt of this opinion prepare an agreed praecipe as to the form for entry of judgment in accordance with the above within 10 days.