Art WAGNER, et al.

v.

CENTRAL LOUISIANA ELECTRIC
COMPANY, INC. and Washington-St.
Tammany Electric Cooperative, Inc.

Civ. A. No. 81–2112.

United States District Court,
E.D. Louisiana.

Aug. 26, 1983.

Joseph Montgomery of Garner & Munoz, Arden Lea, New Orleans, La., for plaintiffs.

William O. Bonin of Landry, Watkins & Bonin, New Iberia, La., John Schwab of Watts & Cassidy, and France W. Watts, III, Franklinton, La., Rufus Olivier, Houston, Tex., for defendants.

**CHARLES SCHWARTZ, Jr., District Judge.**

Pursuant to Fed.R.Civ.Proc. 23(c)(1), plaintiffs moved for a determination that this suit, brought under the Sherman and Clayton Antitrust Acts, 15 U.S.C. §§ 1 and 15, be maintained as a Rule 23(b)(3) class action. A hearing was held on October 27, 1982 to consider plaintiff's motion, whereupon the matter was taken under submission pending the receipt of memoranda from the parties.

Plaintiffs allege that in 1966 the defendants executed an agreement purportedly granting to the Washington-St. Tammany Electric Cooperative ("Co-op") the exclusive right to service that portion of the City of Slidell lying east and south of a dividing line set forth in the agreement,[1] and to the Central Louisiana Electric Company, Inc. ("CLECO"), the exclusive right to service that portion of the City lying west and north of said line. Plaintiffs further allege that the scope of the agreement extends beyond the City limits to encompass the surrounding area, and as such constitutes a conspiracy in restraint of trade in the form of a horizontal allocation of territory, violative of federal antitrust provisions. Plaintiffs seek treble damages pursuant to § 4 of the Clayton Act, 15 U.S.C. § 15. Orally and by amended complaint, plaintiffs withdrew their motion that the class be certified under Rule 23(b)(2).

Plaintiffs seek to represent past and present customers of CLECO residing outside the City of Slidell who are located in an area bounded on one side by the alleged dividing line of the agreement and on the other side by a line running roughly parallel to and approximately 2½ miles north and west of said line, as set forth on a map.

---

1. The dividing line is drawn on a map identified as CLECO 1 at the hearing for class certification (Attachment 1), a copy of a portion of which is annexed hereto as Appendix 1.

The proposed class is divided into five proposed subclasses, as set forth below:

1. Those past and present customers of CLECO within the geographical area which has defined the proposed class who were placed on line between 24 February 1966 and 31 March 1970.

2. Those past and present customers of CLECO within the geographical area which has defined the proposed class who were placed on line by CLECO after 31 March 1970 from a line, any part of which line was put up between 24 February 1966 and 31 March 1970 within the geographical area which has defined the proposed class.

3. Those past and present customers of CLECO within the geographical area which has defined the proposed class who were placed on line between 1 April 1970 and 31 April 1972 which extending line was not within 300 feet of an existing CLECO line.

4. Those past and present customers of CLECO within the geographical area which has defined the proposed class who were placed on line by CLECO after 31 April 1972 and to whom the Co-op would have already extended but for the unlawful Agreement, from lines which presently exist or which the Court can reasonably infer the Co-op would have already extended but for the unlawful Agreement.

5. Those past and present customers of CLECO within the geographical area which has defined the proposed class who were placed on line by CLECO prior to February 1966 who could have changed service to the Co-op between 22 February 1966 and 31 March 1970 but for the unlawful Agreement.

Plaintiffs' Second Supplemental Memorandum at 24.

Plaintiffs allege that members of the proposed class "have been deprived of free and open competition in the distribution and sale of electric power and services, all to [their] detriment and loss" because of said agreement.

With respect to plaintiffs' motion, after considering the requirements of Fed.R.Civ. Proc. 23 and applying such to the evidence, documentation and testimony adduced at the hearing, the Court denies the motion for class certification and the case will proceed as to the named plaintiffs.

THE REQUIREMENTS OF RULE 23.

Rule 23(a) sets forth certain requirements for all class actions. It provides:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

In addition, there are two implied prerequisites that must be met: the first is that a "class" must exist; the second, that the representatives must be members of the class.

Plaintiffs must also satisfy the requirements of Rule 23(b)(3):

An action may be maintained as a class action if the prerequisites of subdivision (a) [above] are satisfied, and in addition: (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

■ Plaintiffs have the burden of establishing that each of these prerequisites to class action is satisfied. *EEOC v. D.H. Holmes Co.,* 556 F.2d 787, 791 (5th Cir.1977) *cert. denied,* 436 U.S. 962, 98 S.Ct. 3082, 57 L.Ed.2d 1129 (1978). In deciding the certification issues, the Court is guided by *Alabama v. Blue Bird Body Company, Inc.,* 573 F.2d 309 (5th Cir.1978), which clarifies the type of proof plaintiffs must adduce in order to satisfy the requirements of Rule 23(b)(3).

## THE IMPLIED REQUIREMENTS OF RULE 23(a).

■ The existence of a class is of course an essential prerequisite to maintaining an action under Rule 23. Consistent with the liberal construction intended for the rule, courts have not required that the class be so clearly ascertainable that every potential member can be readily identified at this stage of the litigation. *Carpenter v. Davis,* 424 F.2d 257, 260 (5th Cir.1970). On the other hand, the class must be sufficiently defined so as to enable the court to determine whether a particular individual is a member of the class. *DeBremaecker v. Short,* 433 F.2d 733, 734 (5th Cir.1970). Ascertainment of class membership is essential in Rule 23(b)(3) actions to give class members the notice required by Rule 23(c)(2). Plaintiffs have defined the putative class using a set of factors that does not lend itself to feasible identification of the class members. The factors include those that are definite and objective, and those that are vague and not capable of application without significant speculation. The objective factors include a clearly delineated geographical area defining the location of the class members; particular dates when class members began receiving service (e.g. customers "who were placed on line between 24 February 1966 and 31 March 1970"); and particular distances from electric lines to which class members' homes were connected (e.g. customers "who were placed on line between 1 April 1970

and 31 April 1972 which extending line was not 300 feet from an existing CLECO line"). However, plaintiffs have furnished no data or evidence to support the existence of data for use in determining class membership according to these factors. The factors the Court considers vague are used to define proposed subclasses 4 and 5. Subclass 4 is defined as "customers ... to whom the Co-op would have already extended [service] but for the unlawful agreement from lines which presently exist or which the Court can reasonably infer the Co-op would have already extended but for the unlawful agreement." Subclass 5 includes "customers ... who could have changed service to the Co-op but for the unlawful Agreement." As to these definitions, the plaintiffs have neither furnished the appropriate data or supportive evidence, nor demonstrated how the data would be applied to determine membership in the two subclasses.[2] Without such, the Court is unable to find that the class is defined so that class members can be readily identified. The Court thus finds that the difficulty in applying the factors enumerated in the definitions to determine membership in said subclasses renders the class action administratively infeasible as to them. Likewise, regarding subclasses 1, 2 and 3, the absence of pertinent data or supportive evidence precludes a finding by the Court that ascertainment of membership in said subclasses is feasible. These three subclasses are also overbroad in that they are not properly limited to those individuals who could have received service from Co-op but for the agreement in question.

Defendants contest the existence of the class on another ground. They claim that La.R.S. 45:123 and two General Orders promulgated by the state Public Service Commission (PSC) pursuant to such statute and dated March 1, 1972 and March 14, 1974, respectively, have prohibited or restricted competition between utilities under a variety of circumstances, so that in the absence of the agreement, competition between the defendants either would not have been le-

---

**2.** Determining whether a particular individual is a member of subclass 4 would seem to re-

quire the Court to make judgments that bear directly on the merits of plaintiffs' claims.

gally permitted, or would have been extremely limited. Given this regulatory environment, defendants thus argue that few of the putative class members could have benefited from competition and thus few could have been injured by defendants' alleged conspiracy. Since defendants' claim, to be discussed more fully, *infra,* relates directly to the merits of plaintiffs' allegations, it is not an appropriate consideration at the certification stage of the proceeding.

Regarding the requirement that the representatives be members of the class, plaintiffs have not demonstrated that any single one of them is a member of any of the five proposed subclasses. The CLECO customer service records submitted in the Court's record indicate that only one of the named plaintiffs, Mr. Lloyd Shubert, received electric service from CLECO prior to 1974. Mr. Shubert's service, according to said records, began in 1973. According to the record, then, none of the plaintiffs could possibly be members of the first, third, or fifth proposed subclasses. As for the second proposed subclass, the plaintiffs have not shown that any prospective representative was "placed on line by CLECO after 31 March 1970 from a line, any part of which line was put up between 24 February 1966 and 31 March 1970". Similarly, as to the fourth proposed subclass, the plaintiffs have not shown that any prospective representative was "placed on line by CLECO after 31 April 1972 and to whom the Co-op would have already extended [service] but for the unlawful Agreement, from lines which presently exist or which the Court can reasonably infer the Co-op would have already extended but for the unlawful Agreement." Plaintiffs have also not demonstrated that they live in the geographical area that defines the proposed class.

The Court thus cannot make the necessary finding that the prospective representatives are members of the putative class.

## THE EXPRESS REQUIREMENTS OF RULE 23(a)

### NUMEROSITY.

■ The evidentiary hearing held October 27, 1982 revealed that the number of current CLECO customers residing outside the City of Slidell exceeds 8,000, as adduced by plaintiffs from a list of current customers. Defendants do not question that this figure satisfies the numerosity requirement. The customer list, however, presumably includes CLECO customers residing outside the geographical area defining the proposed class, and thus is overinclusive. Plaintiffs have offered no evidence regarding the extent of the overinclusion. In addition, plaintiffs have not offered any evidence to show how many past and present customers of CLECO located within the geographical area defining the proposed class actually fit within any of the five subclasses.

Thus, the Court cannot make the necessary finding that the putative class is so numerous that joinder of all its members would be impracticable; accordingly, Rule 23(a)(1) is not satisfied.

### COMMONALITY.

■ The requirement of Rule 23(a)(2), that there be questions of law or fact common to the class, must be distinguished from Rule 23(b)(3), under which common questions must be shown to predominate over questions affecting only individual class members. The minimal commonality requirement is satisfied if two such issues exist. Plaintiffs' allegation regarding the existence and scope of the conspiracy to divide the geographical market area outside Slidell constitutes common issues of law or fact. In order to recover for damages sustained before May 26, 1977, such date being four years prior to the filing of this suit, plaintiffs must prove that defendants fraudulently concealed the alleged conspiracy, thereby tolling the 4-year statute of limitations of § 4B of the Clayton Act, 15 U.S.C. § 15b. Whether the defendants concealed the conduct complained of constitutes an issue of law or fact common to the class. To avail themselves of the tolling doctrine, each individual plaintiff must also show that he failed, despite the exercise of due diligence on his part, to discover the facts forming the basis of his claim. *In re Beef Industry Antitrust Litigation,* 600

F.2d 1148, 1169 (5th Cir.1979) *cert. denied,* 449 U.S. 905, 101 S.Ct. 280, 66 L.Ed.2d 137 (1980); *In re Anthracite Coal Antitrust Litigation,* 78 F.R.D. 709, 719 (M.D.Pa.1978).

The Court thus finds that the requirement of Rule 23(a)(2) has been satisfied.

## TYPICALITY.

Rule 23(a)(3) requires that the claim of the representatives be typical of the claims of the members of the proposed class. Plaintiffs Wagner, Burks, Sequin, et al., as well as the putative class members, are proceeding under the same theory of liability and seeking the same remedy. In order to prevail, they must also establish the same elements of the conspiracy in restraint of trade, i.e. the existence, scope, and efficacy of the conspiracy, as well as damages resulting therefrom. Notwithstanding the extent to which the claims of the representatives and the claims of the class are co-extensive, the potential for the existence of widely varying factual positions between the representatives and class members here is very great; and the factual variance can directly and materially affect the proof required to show the efficacy of the conspiracy, assuming its existence and scope are first proved.

In order to prevail in this private antitrust suit, a plaintiff must demonstrate, *inter alia,* that in the absence of the alleged conspiracy, he would have been serviced by the Co-op. Because of the nature of the regulations affecting Louisiana electric utilities since 1970, *see* discussion *infra,* whether a particular plaintiff would have been served by Co-op depends directly on the proximity of his house to utility distribution lines existing at the time his service commenced. Generally, the farther the point of connection from a CLECO line, and the closer to a Co-op line, the greater the likelihood that the residence would have been serviced by Co-op, and consequently, the easier it is for the particular plaintiff to prove injury in fact, or impact. Conversely, the closer to a CLECO line, and the farther from a Co-op line, the less likely the individual would have been serviced by Co-op. The plaintiffs have offered no evidence relevant to the above considerations. Since impact or injury in fact is the gravamen of a private antitrust suit under the Sherman and Clayton Acts, the absence of such evidence precludes a finding by the Court that the claims of the class representatives are typical of the claims of the members of the putative class.

Rule 23(a)(3) has been interpreted to require that the representative's interest be "sufficiently parallel to the interests of the other class members to assure a vigorous representation of the class." *Donaldson v. Pillsbury,* 554 F.2d 825, 831 (8th Cir.1977), *cert. denied,* 434 U.S. 856, 98 S.Ct. 177, 54 L.Ed.2d 128 (1977).

The Court has heretofore concluded that plaintiffs have not shown that they are members of the class; therefore, there is a danger that those claims that are weak due to circumstances particular to an individual class member's housing situation may not be vigorously prosecuted by representatives who have strong claims and who thus need not proffer the same type of proof to recover under the weaker type of claim.

## REPRESENTATION.

■ Rule 23(a)(4) requires a showing that the representative will fairly and adequately protect the interests of the class. Both the adequacy of the representative and the adequacy of his counsel must be established. Defendants do not question the adequacy of plaintiffs' counsel. The test of adequate representation is whether the representative has a sufficient interest in, and nexus with, the class to assure vigorous prosecution of the claim. *Roper v. Consurve, Inc.,* 578 F.2d 1106, 1112 (5th Cir.1978). Courts also inquire whether the representatives' interests are antagonistic to the class's interests, whether there is antagonism among class members, and whether there is adequate financial support from the representative for the litigation. Of these issues, the last was not questioned. Regarding potential conflicts between class members, the major conflict of interest was removed when plaintiffs redefined the class to exclude Co-op member-customers. By virtue of their dual relationship with the

electric cooperative, Co-op customer-members would have been placed in an inherently conflicting position as plaintiffs to this suit. However, a potential conflict may still exist for class members who also own property serviced by the Co-op since such customers, as members of the Co-op, would share responsibility with Co-op's other member-customers in paying any damages for which Co-op is held liable. As long as these particular customers are identifiable, this potential conflict does not pose an obstacle to certification since these particular customers, if any, can "opt-out" of the class action under Rule 23(c)(2).

■ Defendants also question whether the representatives can adequately represent former or current customers of CLECO who began receiving service from 1966 to 1973, 1973 being the first year when a representative of the putative class received service from CLECO. The Court's finding that no prospective representative has demonstrated his membership in any of the five subclasses precludes a finding under Rule 23(a)(4) that the representation will be fair and adequate. In addition, the Court's findings under Rule 23(a)(3) preclude a finding that the claims of the class members will be vigorously prosecuted. Accordingly, the requirement of Rule 23(a)(4) has not been met.

REQUIREMENTS OF RULE 23(b)(3).

■ In order to determine whether common issues predominate, and whether the class action is superior to individual actions, the Court must first identify the substantive law issues that will control the outcome of the litigation. *See Blue Bird, supra,* at 316. In this case, the plaintiffs' claim involves a violation of § 1 of the Sherman Act, which provides that "every contract, combination ... or conspiracy in restraint of trade or commerce ... is ... illegal." The word "every" is not taken literally. Courts have adopted a "reasonableness" test to judge some restraints; others, however, have been deemed to have such a "pernicious effect on competition," *Northern Pacific Ry. Co. v. United States,* 356

U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958), that they are considered *per se* violations of § 1. Included among these *per se* violations is a horizontal allocation of territory. *United States v. Topco Associates, Inc.,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). The Supreme Court has stated that agreements between competitors at the same level of the market structure to allocate territories in order to minimize competition are "naked restraints of trade with no purpose except stifling competition." *Id.* at 608, 92 S.Ct. at 1134. As such, the law does not permit an inquiry into their reasonableness; nor is it necessary to show an actual effect on prices to establish a violation of § 1.

■ Proof of a violation of § 1 of the Sherman Act alone does not establish civil liability under § 4 of the Clayton Act, 15 U.S.C. § 15. Plaintiffs must also establish proof of "injury to business or property" before a Sherman Act violation becomes cognizable as a private civil remedy. *Blue Bird* at 317. In *Terrell v. Household Goods Carriers' Bureau,* 494 F.2d 16 (5th Cir.) *cert. dismissed,* 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260 (1974), the Fifth Circuit explained the three elements required to establish civil liability: (1) violation of the antitrust laws; (2) the fact of damage, also known as impact or injury in fact; and (3) some indication of the amount of damages. The injury is the gravamen of the antitrust claim. "Whatever the nature of the alleged conspiracy, ... injury is the *sine qua non* for stating a cause of action." *Shumate & Co., Inc. v. National Ass'n of Sec. Dealers, Inc.,* 509 F.2d 147, 152 (5th Cir.1975), *cert. denied,* 423 U.S. 868, 96 S.Ct. 131, 46 L.Ed.2d 97 (1975), *quoted in Blue Bird supra* at 327. *Blue Bird* explained that,

> The term "fact of damage" [(injury)] can be likened to the causation element in a negligence cause of action. The term means simply that the antitrust violation caused injury to the antitrust plaintiff. To make this showing, however, an antitrust plaintiff need not prove that the violation was the sole cause of any alleged injury, but he does need to show

that the violation was a material cause.... This showing, of course, may not be based on speculation. Rather, the required causal link must be proved as a matter of fact and with a fair degree of certainty.

*Id.* at 317. There can be no recovery of damages "where the jury could only speculate as to its occurrence or as to its causal relationship to the anticompetitive activity." *Id.* at 327, quoting *Shumate, supra,* at 153.

The determination of the Rule 23(b)(3) predominance issue depends directly on the amount and quality of evidence required to prove injury. *Shumate* established and *Blue Bird* reaffirmed the principle that the substantive proof required for relief does not vary from individual to class actions, and that for both class and individual actions, " 'impact' is a question unique to each particular plaintiff and one that must be proved with certainty." *Blue Bird, supra,* at 327. In a case involving the horizontal allocation of territory, each plaintiff must show that as a result of a conspiracy, he had to pay supracompetitive prices for the product in question, here electricity. This does not mean, however, that the injury element cannot be proved on a classwide or generalized basis. Whether it can or cannot be is the next question to which the Court's attention is directed.

An analysis of this issue requires the Court to examine the regulation of electric utilities by the State of Louisiana. While an inquiry into the merits of a claim is not an appropriate consideration when determining whether a class should be certified, a full understanding of the underlying facts is essential if the determination under Rule 23(b)(3) is to be properly made. *Blue Bird* at 312.

Competition between electric utilities is circumscribed by La.R.S. 45:123 and two General Orders promulgated by the state Public Service Commission (PSC) to effectuate the purposes of said statute. By Act 34 of 1970, which also amended La.R.S. 45:123, the legislature expressly placed cooperatives under the jurisdiction of the PSC. La.R.S. 45:123 [3] prohibits one electric utility from offering service to a customer who is already being served by another utility; the statute also sets out a procedure whereby a customer who feels aggrieved with his electric service can apply to the PSC for relief. With regard to points of connection not already being served, the statute prohibits one utility from extending its line to serve a prospective customer located within 300 feet of an existing electric line of another utility, unless that customer is also within 300 feet of an existing line of the former utility, which line was in operation on April 1, 1970, and

**3.** La.R.S. 45:123 provides:

§ 123. Stabilizing service by electric public utilities: extension and construction of facilities, regulation thereof.

No electric public utility shall construct or extend its facilities, or furnish, or offer to furnish electric service to any point of connection which at the time of the proposed construction, extension, or service is being served by, or which is not being served but is located within 300 feet of an electric line of another electric public utility, except with the consent in writing of such other electric public utility; provided, however, that nothing contained herein shall preclude (a) any electric public utility from extending service to an applicant for service at an unserved point of connection located within 300 feet of an existing electric line of such electric public utility, unless (i) such line was not in operation on April 1, 1970 and (ii) the point of connection is located within 300 feet of an

existing electric line, of another electric public utility, which line was in operation on said date, or (b) any electric public utility from extending service to its own property, or to another electric public utility for resale; and provided further that any consumer who feels aggrieved with the electric service being received by him may apply to the Louisiana Public Service Commission for an order directed to his present supplier to show cause why the consumer should not be released from said supplier, and if the commission shall find that the service rendered to such consumer is inadequate and will not be rendered adequate within a reasonable time the release shall be granted.

As used in this section, an "electric line" is a line constructed and operated for the transmission and/or distribution of electricity and which was not originally constructed for the principal purpose of preempting territory....

the existing line of the latter utility was not in operation on that date.

The first of the two pertinent General Orders, issued on May 1, 1972, and entitled, "In Re: Definition of Territory of Electric Utilities,"[4] reiterated the statutory prohibition against extension of lines to points within 300 feet of another utility's facilities, and in addition prohibited (a) duplication of another utility's lines and (b) extension of one utility's lines to serve customers who could be served "more economically and justifiably" by another electric utility. The second General Order, issued on March 12, 1974, and entitled, "In Re: Duplication of Electric Service,"[5] prohibited an electric

4. General Order

"In re: Definition of Territory of Electric Utilities" reads as follows:

Act 34 of the 1970 Louisiana Legislature gave authority to this Commission to regulate electric public utilities.

Section 123 of Title 45 of the Louisiana Revised Statutes of 1950 [*supra* note 3] was amended and reenacted to read as follows:

\* \* \* \* \* \*

As a result, it appears necessary and desirable for this Commission to adopt an Order pertaining to the invasion of territory by electric utilities subject to its jurisdiction so as to effect economies in the service of electricity and thus keep rates within reasonable bounds. It is accordingly

ORDERED, that all electric public utilities subject to the jurisdiction of this Commission abide by the instructions set out in Section 123 of Title 45 as amended and re-enacted. It is further

ORDERED, that no extension of "electric line" shall be made by any electric public utility that will duplicate the service of another electric public utility, nor shall extensions be made to serve prospective customers that can be more economically and justifiably served by another electric public utility. It is further

ORDERED, that any dispute that may arise between electric public utilities shall be settled by making proper application to this Commission and upon the taking of evidence, the Commission will render its written decision.

BY ORDER OF THE COMMISSION
BATON ROUGE, LOUISIANA
May 1, 1972

5. General Order

"In re: Duplication of Electric Service" reads as follows:

At the session of the Louisiana Public Service Commission held at its office in Baton Rouge, Louisiana, on March 12, 1974, the matter of the most economical and least wasteful utilization and development of electric public utility facilities was considered.

It is the opinion of this Commission that in order to effect economies in the service of electricity, and, thus, keep rates therefor within reasonable bounds, economic and wasteful practices should be prohibited. It is determined that the paralleling and duplication of existing transmission or distribution lines as defined in Louisiana Revised Statutes 45:123 or the extensions of either by electric public utilities to serve customers readily accessible to like facilities of an electric public utility already providing service in the immediate area is not in the public interest, and that such practices ultimately lead to wasteful competition and unwise expenditures and investments which become a burden upon the rate payers.

It is recognized that while in some areas there is not clear line of demarcation between the service area of electric public utilities, for the purpose of this order, the service area of electric public utility is that area which, as a result of the existence of transmission and distribution lines, is readily accessible by economically feasible extensions from such existing facilities. This necessarily includes customers already receiving service. It is, accordingly, ordered

That no extension of electric transmission or distribution lines shall be made by an electric public utility that will duplicate the transmission and distribution lines (as defined in Louisiana Revised Statutes 45:123) of another like utility, nor shall extensions be made to serve customers that could be served from such electric public utility facilities already in existence in an economic and justifiable manner. If a public utility, for good cause, refuses to serve a prospective customer within its service area, another like utility may serve the said customer upon written authority of this Commission.

If economies or reliability can be effected in the construction of transmission or distribution lines by a utility company through a service area already being served by another public utility, such construction shall not be regarded as an "invasion" so long as no such transmission or distribution lines are tapped for service in the said service area. In the event that a tap from such transmission and distribution line is necessary or desirable, it shall be made only upon separate and specific written authority of this Commission after hearing.

The term public utility shall include electric cooperatives and public utility activity or service under the jurisdiction of the Commission....

BY ORDER OF THE COMMISSION,
BATON ROUGE, LOUISIANA
March 12, 1974

utility from building its lines through another utility's "service area" unless "economies or reliability" would result, and further prohibited an electric utility from extending its lines to serve customers who could be served through "economic and justifiable" extensions of another utility's lines.

In short, the foregoing regulatory provisions prohibit electric utilities from competing for existing customers, absent prior permission from the PSC, and impose restrictions on the ability of utilities to compete for new customers. With regard to prospective customers located within 300 feet of an existing line of one utility, competing offers to serve those customers are prohibited, except when the competing utility itself has an existing line within 300 feet of the proposed point of connection and such line has been operating since April 1, 1970. With regard to prospective customers located more than 300 feet from an existing line, only those utilities that could serve those customers through "economically feasible" extensions of their existing lines, as determined by the PSC, would be permitted by the applicable regulations to provide such service.

The statute and General Orders have provided the legal basis on which the PSC has acted to prohibit what it has determined to be wasteful or duplicative services and facilities. See, e.g., Claiborne Elec. Coop., Inc. v. Louisiana Public Serv. Comm'n, 388 So.2d 792 (La.1980); Beauregard Elec. Coop., Inc. v. Louisiana Public Serv. Comm'n, 378 So.2d 404 (La.1978); Louisiana Power & Light Co. v. Louisiana Public Serv. Comm'n, 353 So.2d 718 (La.1977); Central Louisiana Elec. Co., Inc. v. Louisiana Public Serv. Comm'n, 344 So.2d 1046 (1977).

The existence of the aforementioned provisions affecting the ability of defendant utilities to compete materially distinguishes the proof required to show impact in this case from the proof required in In re South Central States Bakery Products, 86 F.R.D. 407 (W.D.La.1980). In contrast to the instant case, which involves a heavily regulated industry where competition is not the norm, Bakery Products involved a price-fixing conspiracy in an unregulated industry, i.e., where competition is the norm. Accordingly, in Bakery Products mere proof of purchase by a class member at a supracompetitive price constituted proof of impact. Id. at 421. Such would not establish impact here because plaintiffs must first prove that competition would have existed in the absence of the conspiracy. Given the regulatory environment in which defendants operate, proof of impact or injury in fact requires plaintiffs to meet a twofold burden: (1) that in the absence of the agreement, Co-op would have been authorized to and would have in fact served plaintiffs; and (2) that had Co-op served plaintiffs, its rates would have been lower than the rates actually paid by plaintiffs. Determination of the first element of impact requires application of the relatively imprecise standards set forth in the statute and General Orders for the periods in which those provisions were in effect.

For the period beginning with the execution of the agreement, February 24, 1966, and ending with the effective date of La. R.S. 45:123, April 1, 1970, Co-op's ability to compete was not restricted by the state; thus, the plaintiffs would have to show, using heretofore unspecified standards, that Co-op would have offered service to customers who came on line during that period. Lacking any evidence to the contrary, such as a showing that development occurred in large subdivisions, the facts as developed preclude a finding by the Court that plaintiffs could prove impact on any basis but an individual basis; i.e., each plaintiff would have to demonstrate individually that Co-op would have served his home. Similar evidentiary defects characterize the development of the facts relevant to the period from April 1, 1970 to May 1, 1972 (date of the first General Order), during which time only the "300 feet rule" of La.R.S. 45:123 restricted competition by cooperatives. Regarding new customers living beyond 300 feet of an existing line who began service during that period, there is no

evidence from which the Court can make a finding that plaintiffs could prove on a generalized basis that Co-op would have served such customers. As for the period beginning with the promulgation of the first General Order and running to date, the PSC's economic feasibility standards have governed disputes between utilities seeking to serve new customers located more than 300 feet from existing lines. Again, lacking evidence to the contrary, the Court cannot make a finding that plaintiffs could prove on a classwide basis that Co-op would have served customers whose service commenced during this period and who lived beyond 300 feet of an existing line. Considering the facts as adduced, the Court finds that plaintiffs have not made the required showing that proof of impact could be established on a generalized basis.

In so holding, the Court weighed the testimony of Mr. Louis Quinn, Executive Secretary of the PSC. When posed the hypothetical question of how the PSC would determine which of two utilities would be authorized to serve 8,000 new customers, Mr. Quinn responded that as to those customers not residing within 300 feet of an existing electric line, the PSC's determination would have to be made on a case-by-case (individual) basis, and the determination would be based on economic feasibility and efficiency. The Court is mindful of the fact that individual determinations would probably not be required to decide which utility would serve the numerous homes contained in the same subdivision. Then, rather, only one or several decisions would probably be necessary. However, plaintiffs failed to proffer evidence regarding the housing pattern and development of the Slidell area, and the Court cannot speculate as to such based on the unsubstantiated statements in plaintiffs' memoranda.

Plaintiffs must also show that the other aspect of impact—that had Co-op served plaintiffs, its rates would have been lower than the rates actually paid by plaintiff—is also susceptible to proof on a generalized basis. Serving new customers requires a utility to expend money on construction of new electric lines and other equipment necessary for service. The effect that such expenditures would have had on Co-op's rates in the absence of the agreement may be inextricably tied to or subsumed by the first issue, whether Co-op would have served such customers in the first place. In other words, proof that Co-op would have served plaintiffs probably depends on whether providing such additional service would have been economically feasible. If so, the determination of economic feasibility implies that Co-op's rates would probably not have been significantly affected by such additional customers. As with the first aspect of impact, however, the dearth of evidence on this issue precludes the Court from finding that proof of Co-op's rates, in the absence of the conspiracy, could be established on a classwide basis.

Having so held, the Court does not reach the issue of whether proof of damages can be established on a classwide basis. As a general matter, however, it would seem that the variance in the plaintiffs' consumption histories would not pose a problem of proof since the product in question, electricity, is homogeneous, and since consumption records are available, at least for current consumers. Under such circumstances, use of a mechanical formula would likely be appropriate.

As previously discussed under Rule 23(a)(2), the existence and scope of the alleged conspiracy, as well as the fraudulent concealment of such conspiracy, are issues common to the class. For the fraudulent concealment tolling doctrine to apply, however, additional showings are required of the putative class: each individual plaintiff must show that he failed, despite the exercise of due diligence on his part, to discover the facts forming the basis of the claim. *In re Beef Industry Antitrust Litigation, supra,* at 1169; *In re Anthracite Coal Antitrust Litigation, supra,* at 719. The Court is unable to find that proof of failure to dis-

cover and due diligence can be established on a generalized basis. Absent such proof, the plaintiffs would be barred from recovering damages sustained before May 26, 1977.

■ The Court, for the reasons herein set out, is unable to find that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members. Having so held, the Court does not reach the issue whether the class action is superior to other available methods of adjudication.

Since the suit was filed more than 18 months ago, the Court has given plaintiffs ample opportunity to establish the propriety of the class action. The evidentiary hearing, the amended complaint, and two supplemental memoranda in support of class certification have failed to provide the evidence required by Rule 23. Accordingly, the Court denies plaintiffs' motion for certification of the class action.